UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-80521-CIV-MARRA/SELTZER

SEAN PENDLEBURY and LAUREL
OVERTON,

      Plaintiffs,

vs.

STARBUCKS COFFEE COMPANY,
a foreign corporation qualified to do
business in Florida as
STARBUCKS CORPORATION,

      Defendant.

_____/

## DEFENDANT STARBUCKS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO PERMIT COURT-SUPERVISED NOTIFICATION

In accordance with the Court's August 27, 2004 Order, defendant Starbucks Corporation ("Starbucks") hereby opposes Plaintiffs' Motion to Permit Court-Supervised Notification Pursuant to 29 U.S.C. § 216(b). As explained more fully below, based upon the allegations in the complaint, the deposition testimony of the plaintiffs, and the declaration of another South Florida Starbucks Store Manager submitted herewith, plaintiffs have not satisfied their burden to show that they are "similarly situated" to the putative class that they seek to represent. To the contrary, it is apparent that plaintiffs' overtime claims are based upon factual allegations that, even if accepted as true, are personal and not at all representative of other Starbucks store managers. Indeed, the deposition testimony makes clear they believe that their respective duties and responsibilities as Starbucks store managers are "different" even between each other. *See* Pendlebury Tr. at 30:4-32:4. Accordingly, the Court should exercise its discretion to deny plaintiffs' request for notice to all Starbucks Store Managers nationwide.

I.       FACTUAL BACKGROUND

Plaintiffs are Store Managers for two Starbucks retail locations within seven miles of each other in Broward County, Florida.  Complaint ¶¶ 2, 9.  Each Starbucks store contains a staff of "partners" that include a number of entry-level "baristas," who make and serve drinks, run the cash register, and perform other tasks at the direction of their supervisors, a complement of shift supervisors, and, in some stores, one or more assistant store managers.[1]  *See, e.g.,* Overton Tr. at 15:12-16:19, 32:2-7, 62:7-13; Pendlebury Tr. at 29:2-9.[2]  The highest ranking partner in each store is the Store Manager, who is the "boss" of the store.  Overton Tr. at 13:5-12; Pendlebury Tr. at 27:2-16.

Store Managers are responsible for virtually every aspect of their store's operation.  As the highest-ranking partner in the store, Store Managers are responsible for interviewing, hiring, training, disciplining, evaluating, scheduling, and planning and directing the work of the store's partners.  Overton Tr. at 21:24-23:13, 27:18-31:14, 35:4-47:21, 50:18-61:12, 84:1-85:8; Pendlebury Tr. at 36:20-42:15, 125:10-126:13; *see also* Starbucks Store Manager Job Description (attached hereto as Exhibit 3).  Store Managers are also responsible for reviewing and analyzing numerous reports that reflect the store's current and historical performance, managing inventory and supplies, and enforcing Starbucks' various policies and procedures.  Overton Tr. at 59:10-61:12, 97:1-103:23, 124:11-25; Pendlebury Tr. at 82:6-88:15, 175:16-178:16.  In some cases, Store Managers delegate aspects of these tasks to their shift supervisors.  *See, e.g.,* Overton Tr. at 98:10-99:10.  However, the Store Manager remains the partner in the store ultimately responsible for its performance.  *Id.*

---

[1] Starbucks refers to its employees as "partners."
[2] Excerpts from plaintiffs' deposition transcripts and relevant exhibits and relevant exhibits are attached hereto as Exhibits 1 and 2.

Although each Store Manager is responsible for attending to the management of the store, marked differences exist in the ways plaintiffs and other area Store Managers choose to manage their stores. Plaintiff Overton testified that "[e]veryone runs their store differently." Overton Tr. at 197:4-22. Plaintiff Pendlebury, who was present during plaintiff Overton's deposition, claimed that what he did as a Starbucks Store Manager was "different" from plaintiff Overton, and that he "kn[e]w the responsibility of a Starbucks store manager are different than what... [plaintiff Overton] said yesterday." Pendlebury Tr. at 30:4-32:4.

Among those areas in which the day-to-day operations of Starbucks Store Managers differ is the amount of time spent on exempt executive tasks. Store Manager Reniero Valdes of the City Place Starbucks Store in West Palm Beach spends between 26.5 and 38 hours each week on interviewing and hiring, formal training, partner evaluations, scheduling, inventory analysis, resolving customer complaints, staff meetings, and cash control, with additional time spent monitoring, correcting, and training partners while "on the floor" of the store. Declaration of Reniero Valdes ¶¶ 7-11, 13-14, 17 (attached hereto as Exhibit 4).

By contrast, plaintiff Overton testified that she spends at least 11-16 hours of her 45-hour week on administrative managerial tasks and scheduling, with additional time on the floor training employees, monitoring, directing, and correcting their work, and observing employees for purposes of drafting their evaluations. Overton Tr. at 27:18-30:16, 85:15-86:8, 94:13-97:13. Plaintiff Pendlebury testified to yet another division of work time, claiming that he spends only 20 percent of his time on executive tasks, and the remaining 80 percent "as a glorified barista." Pendlebury Tr. at 31:12-24. However, the store schedules prepared by Pendlebury present a different picture of his day-to-day activities, showing that he consistently spends between 40 and 70 percent of his time in a given week on training, meetings, and other executive tasks off the

3

floor.  Pendlebury Tr. at 127:9-130:8; Excerpts from Exhibit 8 to Pendlebury Deposition (Schedules for 11/23/03, 1/11/04, 2/1/04, 2/22/04, 4/11/04, 4/18/04, 5/16/04, 5/23/04, and 6/20/04 reflecting off-the-floor managerial tasks (referred to as "T" time on schedules) as 48%, 43%, 71%, 67%, 44%, 46%, 40%, 40%, and 54% of total weekly time, respectively).

The number of partners in each store also varies.  Plaintiffs manage staffs of between 10 and 15 partners who work a combined total of approximately 300 hours per week.  Overton Tr. at 62:7-13, 246:2-16; Pendlebury Tr. at 29:2-9.  Other stores in South Florida are considerably larger, with staffs of twenty or more partners working in excess of 450 hours per week.  Valdes Decl. ¶ 4.  The number of partners on the floor in a particular store at any one time varies based on the total business volume of the store, the anticipated traffic in the store during peak and non-peak periods of the day, and whether the store is in "peak" season.  *See, e.g.,* Overton Tr. at 87:22-88:18, 273:12-274:4; Excerpts from Exhibit 8 to Pendlebury Deposition; Valdes Decl. ¶¶ 4, 10.

Although plaintiffs claim in conclusory fashion that they are "similarly situated" to other Store Managers nationwide in their complaint, their purported knowledge of other "similarly situated" class members is limited to hearsay evidence gathered from other Store Managers in Palm Beach and Broward County, Florida.  Pendlebury Tr. at 49:20-53:30.  Both plaintiffs admit that they do not really know how Store Managers outside of their geographic area run their stores.  Plaintiff Overton admitted that "unless you have been in the store and observed it you wouldn't know how an individual store was being run."  Overton Tr. at 197:4-22.  Similarly, plaintiff Pendlebury conceded that he does not have any personal knowledge of what other Store Managers do, other than the managers in Palm Beach and Broward County.  Pendlebury Tr. at 51:20-25.

II.    APPLICABLE LEGAL STANDARDS

A.    "Collective Actions" Under 29 U.S.C. § 216(b)

In order to maintain a collective action under 29 U.S.C. § 216(b), plaintiffs must establish that they are "similarly situated" to the putative class "with respect to their job requirements and with regard to their pay provisions." *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). The burden of meeting the "similarly situated" standard remains at all times with the plaintiff. *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (citing *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996)).

A court is empowered, in its discretion, to facilitate the issuance of notice to other "similarly situated" plaintiffs that they may opt-in to an FLSA collective action, but only in "appropriate cases." *Haynes v. Singer Co.*, 696 F.2d 884, 886 (11th Cir. 1983). The Eleventh Circuit has endorsed a two-stage certification process in collective action cases. *Hipp*, 252 F.3d at 1218. At the first stage, "the district court makes a decision—usually based on only the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members. Because the court has minimal evidence, this determination is made using a fairly lenient standard...." *Id.* (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir. 1995)). A "relaxed" burden, however, is "not a 'minimal' one." *Reed v. Mobile County School Sys.*, 246 F. Supp.2d 1227, 1236 (S.D. Ala. 2003).

Moreover, this leniency dissipates where discovery has been conducted and the record shows factual variances within the purported class. *See, e.g., Holt v. Rite Aid Corp.*, -- F. Supp.2d --, 2004 WL 1908105 at *7 (M.D. Ala. Aug. 23, 2004); *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp.2d 493, 498 (D.N.J. 2000). A preliminary determination at the notice stage that plaintiffs are "similarly situated" is made based on all of the evidence before the Court.

5

*Grayson*, 79 F.3d at 1097-98. Evidence that plaintiffs are not similarly situated precludes plaintiffs from proceeding on a collective basis, regardless at which stage of the litigation this fact becomes apparent.

Even if the "fairly lenient" standard is applied, the plaintiff must make "some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions." *White v. Osmose, Inc.*, 204 F. Supp.2d 1309, 1314 (M.D. Ala. 2002). "[T]he court must be satisfied that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in [the] case." *Mike v. Safeco Ins. Co. of America*, 274 F. Supp.2d 216, 220 (D. Conn. 2003). Disparate factual and employment settings of the individual plaintiffs may make collective action treatment inappropriate. *Brooks v. BellSouth Telecom., Inc.,* 164 F.R.D. 561, 568 (N.D. Ala. 1995), *aff'd* 114 F.3d 1202 (11th Cir. 1997); *see also Stone v. First Union Corp.*, 203 F.R.D. 532, 543 (S.D. Fla. 2001).

B.     The "Executive" Exemption to the FLSA's Overtime Requirements

Plaintiffs' complaint seeks collective action treatment based on their contention that they are not exempt "executive" employees under the FLSA.  Complaint ¶¶ 9-16; *see* 29 U.S.C. § 213(a)(1) (exempting "*bona fide* executive... employees" from the overtime and minimum wage provisions of the FLSA).  In order to qualify as an exempt executive under the FLSA's implementing regulations, an employee that is paid at least $250 per week on a salary basis must: (1) have as their "primary duty" the "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" and (2) perform

6

work that "includes the customary and regular direction of the work of two or more employees."[3] 29 C.F.R. § 541.1(f).

The exempt status of an employee cannot be made based on an employee's job classification or job description, but instead "depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." *See, e.g., Rite Aid,* 2004 WL 1908105 at *5 (quoting *Morisky,* 111 F. Supp.2d at 498). A determination that an employee's "primary duty" is management must also be made "based on all the facts in a particular case." 29 C.F.R. § 541.103. "[A]n employee who spends over 50 percent of his time in management would have management as his primary duty." [4] *Id.* Where an employee spends less than 50 percent of his or her time on management tasks, the regulations provide a number of factors to assist in determining whether the employee's "primary duty" is management, including (1) the amount of time the employee spends on exempt and non-exempt tasks, (2) the relative importance of managerial duties compared to other duties, (3) the frequency with which the

_____

[3] As of August 23, 2004, new regulations promulgated by the U.S. Department of Labor govern the assessment of the exempt status of executives under the FLSA. Under the revised regulations, an employee is an exempt executive if he or she: (1) is compensated on a salary basis of at least $455 per week; (2) has as their primary duty management of an enterprise or a customarily recognized department or subdivision; (3) customarily and regularly directs the work of two or more employees; and (4) has the authority to hire or fire employees, or whose recommendations regarding hiring, firing, advancement, promotion, or other change in status is given particular weight. 29 C.F.R. § 541.100 (revised regulations).

[4] The Department of Labor's regulations do not define the term "management," but do provide examples of the type of duties considered to be exempt managerial work, including: interviewing, selecting, and training employees; setting and adjusting rates of pay and hours of work; directing employee work; maintaining employee production or sales records for supervisory purposes; appraising employee productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances and disciplining employees; planning work; determining the techniques to be used in work; apportioning work among employees; determining the types of materials, supplies, machinery, or tools to be used or merchandise to be bought, stocked, or sold; controlling the flow or distribution of materials or merchandise and supplies; and providing for the safety of the employees and the company's property. 29 C.F.R. § 541.102(b).

employee makes discretionary decisions, (4) the employee's relative freedom from supervision, and (5) the relationship between the employee's salary and the wages paid to the employees who perform relevant non-exempt work.[5]  29 C.F.R. § 541.103.

The regulations' requirement that an exempt executive "customarily and regularly" supervise two or more full-time employees may be met by different combinations of part-time employees that, when aggregated, work the equivalent of an 80-hour week.  29 C.F.R. § 541.105(a).  The existence of weeks in which the executive did not supervise the equivalent of two or more employees does not necessarily defeat application of the exemption, so long as the executive "customarily and regularly" met the requirement.  *Murray v. Stuckey's, Inc.*, 50 F.3d 564, 568-69 (8th Cir. 1995).  A manager "customarily and regularly" supervises two or more employees if, after review of the total number of employee work-hours supervised each week over the relevant period, the evidence demonstrates that the manager spent the vast majority of his or her time managing at least two employees.[6]  *Id.*

III.   ARGUMENT

Plaintiffs' own testimony and their theory of this case contradict their claim that this case is suitable for collective action treatment.  Like the store manager plaintiffs attacking their

---

[5] Under the revised regulations, an employee's primary duty is the "principal, main, major, or most important duty that the employee performs."  29 C.F.R. § 541.700(a) (revised regulations).  As under the previous regulations, useful factors for determining an employee's primary duty include the amount of time spent on exempt managerial tasks, the relative importance of exempt and non-exempt duties, the relative freedom of the employee from direct supervision, and the relationship between wages earned by the managerial employee at issue and employees performing similar non-exempt work.  *Id.*  The revised regulations no longer identify the frequency of a managerial employee's discretionary decision-making as an explicit factor in determining their exempt status.  *Id.*

[6] Plaintiffs' testimony demonstrates that they each qualify as exempt from the FLSA's overtime requirements under the executive exemption as a matter of law.  Starbucks therefore intends to file motions for summary judgment as to both named plaintiffs no later than September 24, 2004

classification as exempt executives before Judge Albritton in the Middle District of Alabama, plaintiffs "are arguing as a matter of fact, rather than of formal job description, that they are performing non-managerial duties for the majority of their working hours." *Rite Aid*, 2004 WL 1908105 at *4-5 (rejecting plaintiffs' argument that policy of classifying store managers as exempt satisfied burden to establish that plaintiffs were "similarly situated"). Because plaintiffs claim that "on a task-to-task, day-to-day basis" they spend more time on non-exempt tasks than exempt executive tasks, "the merits of… [plaintiffs'] claim[s] will turn upon evidence relating to… [plaintiffs'] day-to-day tasks, and not upon any… [employer] policy or decision." *Mike*, 274 F. Supp.2d at 221. Similarly, plaintiffs' contention that they do not physically supervise two or more employees will require a detailed inquiry into the actual circumstances prevailing at each store. The need for these individual-by-individual inquiries, as demonstrated by plaintiffs' own differing testimony on these subjects, bars plaintiffs from proceeding on a collective basis.

The Court should deny plaintiffs' motion for three reasons: (1) plaintiffs have not met their burden of establishing that they are similarly situated to other Store Managers within their district in Florida, much less all Store Managers nationwide; (2) plaintiffs own testimony demonstrates that Store Managers are not "similarly situated" with respect to the amount of time they spend on exempt tasks, requiring individualized inquiry into the day-to-day activities of each Store Manager; and (3) plaintiffs' own testimony demonstrates that they are not "similarly situated" with respect to the total number of partner hours they physically supervised, requiring a store-by-store and week-by-week examination to address plaintiffs' contention that Store Managers do not satisfy the requirements of the executive exemption.

A.    Plaintiffs Have Not Met Their Burden To Establish That They Are "Similarly Situated

Plaintiffs' motion for court-facilitated notice makes no effort to establish that plaintiffs are similarly situated with respect to their job requirements or the day-to-day tasks that they perform. Moreover, plaintiffs' motion fails to explain how the admitted variances in working time and staffing between Store Managers that emerged in their depositions can be addressed without a detailed examination of each Store Manager's day-to-day operations. Rather, plaintiffs assert that they are "similarly situated" solely because of Starbucks' "policy, practice, and procedure of classifying these employees as exempt." Plaintiffs' Motion to Permit Court Supervised Notification at 6.

Plaintiffs mistakenly believe that any "decision, policy, or plan" may support the sending of a collective action notice to thousands of store managers nationwide. The "similarly situated" standard, however, requires more. In FLSA exemption cases, the fact that the employer has categorized an entire job title as exempt does not mean that plaintiffs have established that each person within the job title is "similarly situated."[7] *Rite Aid*, 2004 WL 1908105 at *4-5; *Mike*, 274 F. Supp.2d at 220-21; *Morisky*, 111 F. Supp.2d at 499. Indeed, accepting that employer job classifications *ipso facto* establish that all employees within the classification are "similarly

───────────────

[7] Plaintiffs reliance on Age Discrimination in Employment Act cases permitting notice to issue upon a showing that a single "decision, policy, or plan" of age discrimination may have existed is misplaced. Pl. Notice Motion at 5-6. When plaintiffs have been adversely impacted by a single class-wide policy or plan infected by age discrimination, there is not necessarily the need to examine individual instances of age discrimination for each putative class member. *See Marsh v. Butler County School Sys.*, 242 F. Supp.2d 1086, 1093 (M.D. Ala. 2003) ("The [similarly situated] analysis of the ADEA cases in which a pattern and practice was alleged is difficult to apply in FLSA cases...."). By contrast, employer job classifications are largely irrelevant in FLSA exemption cases, since the proper inquiry is whether the employee's actual tasks qualified them for the exemption. *See, e.g., Rite Aid*, 2004 WL 1908105 at *5; *Morisky*, 111 F. Supp.2d at 498.

situated" is inconsistent with the FLSA's demand that exemption determinations be made based on the actual duties performed by a particular employee. *See, e.g., Ale v. Tennessee Valley Authority*, 269 F.3d 680, 688-89 (6th Cir. 2001) ("[T]he determination of whether an employee is exempt is an inquiry that is based on the particular facts of his employment and not general descriptions.").

Plaintiffs' failure to meet their burden cannot be excused by their decision to seek conditional certification based solely on their conclusory allegations at the earliest stages of the litigation. As described above, the preliminary determination at the notice stage that plaintiffs are "similarly situated" to the members of the purported class is based on all of the evidence before the Court. Plaintiffs here have failed to make any showing that they are similarly situated with respect to their day-to-day job activities. Nor could they, as their own evidence shows that Store Managers are not "similarly situated."

B.      Plaintiffs Are Not "Similarly Situated" With Respect to the Amount of Time They Spent on Exempt Tasks

Plaintiffs' principal argument as to the merits of their case is that their primary duty is not "management" because they spend less than 10 percent of their time on exempt managerial tasks. Complaint ¶ 11. This argument is, as an initial matter, inconsistent with their sworn deposition testimony. Plaintiff Overton testified that she spends at least 25-35 percent of her time on administrative managerial tasks and scheduling, with additional time on the retail sales floor "constantly" training employees, monitoring, directing, and correcting their work, and observing employees for purposes of drafting their biannual evaluations. Overton Tr. at 27:18-30:16, 85:15-86:8, 94:13-97:13. Plaintiff Pendlebury claimed that he spends 20 percent of his time on executive tasks, although the store schedules he drafted and amended reflect that he consistently spends between 40 and 70 percent of his time in a given week on training, meetings, and other

executive tasks off the floor.  Pendlebury Tr. at 31:12-24, 127:9-130:8; Excerpts from Exhibit 8

to Pendlebury Deposition (schedules reflecting off-the-floor managerial tasks as between 40-

71% of total weekly time).[8]

     Notwithstanding the inconsistencies between the allegations in the verified complaint and

plaintiffs' deposition testimony, plaintiffs' theory of this case requires that they proceed

individually with their claims, rather than collectively.  Plaintiffs allege that the time spent by

Store Managers on non-exempt tasks disqualifies them as exempt executives.  Where each Store

Manager divides their time differently, that claim, by its very nature, must be evaluated on an

individual basis.

     The problems inherent in applying the collective action provisions to exemption cases

where employees spend varying amounts of time on exempt work were recently addressed in

*Rite Aid* and *Mike*.  Plaintiffs in *Rite Aid* sought collective action treatment for a putative

nationwide class of store managers and assistant store managers, contending that they spent more

than 50 percent of their time performing the same tasks as hourly employees.  *Rite Aid*, 2004 WL

1908105 at *6-7.  The district court observed that

> [T]his is not a case where janitors are being classified as exempt executives.  Evidence
> before the court of the formal, written job descriptions of Store Managers and Assistant

---

[8] Plaintiffs' argument is also legally dubious.  It is well established that store managers
that spend 90 percent of their time on non-exempt tasks such as cleaning, running the cash
register, or cooking may nonetheless be properly classified as exempt executives.  *See, e.g.,
Donovan v. Burger King Corp.*, 672 F.2d 221, 227 (1st Cir. 1982)  ("[T]he person 'in charge' of a
store has management as their primary duty, even though he spends the majority of his time on
non-exempt work and makes few significant decisions"); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d
1104, 1116 (9th Cir. 2001) (recreational vehicle park managers who spent 90 percent of time on
non-exempt duties had management as primary duty); *Murray v. Stuckey's Inc.*, 939 F.2d 614,
617-18 (8th Cir. 1991) (convenience store managers who spent 65-90 percent of time on non-
exempt duties had management as primary duty); *see also* 29 C.F.R. § 541.103 (manager that
spends more than 50 percent of time on production or sales work has management as primary
duty if he engages in managerial tasks while in charge of a department or subdivision).

> Store Managers contains many managerial tasks.  It is only once the Plaintiffs' testimony
> as to the degree to which other tasks are performed that the application of the exemption
> becomes questionable.

*Id.* at *5.  Noting that the store managers testified as to spending differing amounts of time on

their exempt tasks, a factor in determining whether their primary duty was management, the

district court held that it could not find any identifiable group to be similarly situated.  *Id.* at *6-

8.

The *Rite Aid* court cited with approval the district court decision in *Mike*, which

addressed the identical issue in the context of a putative collective action brought by an

employee categorized as exempt under the "administrative" exemption.  *Id.* at *5.  Faced with

the same time-based factor to assist in determining the employee's "primary duty," the *Mike*

court concluded that it would be required to "hear evidence regarding Mike's day-to-day tasks,

roughly estimate how much time Mike spent performing administrative tasks, and then decide

whether the administrative tasks define or predominate his job."  *Mike*, 274 F. Supp.2d at 220.

Even without the presence of varying testimony regarding the time spent on exempt tasks, the

court found that "[b]ecause the proof in this case is specific to the individual, Mike has not

provided evidence of a common thread binding his proposed class of employees."  *Id.* at 220-21.

In this case, plaintiffs admit that the amount of time spent on managerial tasks varies,

even between themselves and the theoretical Store Manager identified in their complaint.  After

hearing plaintiff Overton testify that she spent between 25-35 percent of her time on various

management tasks, along with additional time on the floor training partners and monitoring and

correcting their work, plaintiff Pendlebury was asked directly to describe "some of the ways that

what you do as a store manager at Starbucks is different than what you heard Ms. Overton say

that she does as a store manager."  He responded:

A:      Well, 80 percent of my time is actually spent on the floor selling coffee, wearing the green apron, making frappuccinos, cleaning the bathrooms, stocking the pastry case, cleaning the floors, wiping windows. I highly doubt that those are considered managerial.

Q:      And so you believe that's different than what you heard Overton testify yesterday?

A:      Yes.

Pendlebury Tr. at 31:12-32:4. Review of the time spent by another Store Manager within miles of plaintiffs in South Florida produces a third result, with approximately 60-85 percent of each week spent on interviewing and hiring, formal training, partner evaluations, scheduling, inventory analysis, resolving customer complaints, staff meetings, and cash control, and additional time spent monitoring, correcting, and training partners while "on the floor" of the store. Valdes Decl. ¶¶ 7-11, 13-14, 17.

The record shows that there are significant differences in the amount of time spent on exempt and non-exempt tasks by the two named plaintiffs and a third Store Manager in the area. Plaintiffs' argument that Store Managers do not have management as their primary duty based on the time they spend on non-exempt tasks can therefore only be resolved through individualized discovery and testimony by each Store Manager. Plaintiffs are not "similarly situated" if such individualized inquiries are necessary.

C.      Plaintiffs Are Not "Similarly Situated" With Respect to the Total Number of Partner Hours They Physically Supervised

Plaintiffs' argument that they do not satisfy the regulations' requirement that they customarily supervise the equivalent of two or more employees also requires individualized inquiries unsuitable for collective action treatment. Plaintiffs claim that they are non-exempt because they did not physically work with two or more partners at all times while they were on

the floor, despite the fact that they ultimately supervised 10-15 partners.[9]  Overton Tr. at 277:3-278:13; Complaint ¶ 16.  Again, plaintiffs own testimony conflicts with the allegations in their verified complaint: their authenticated store schedules show them at the store managing well in excess of 80 partner working hours each week.  *See, e.g.,* Pendlebury Dep. Ex. 8 at 5/16/04 Schedule (reflecting plaintiff at store for 107.5 total partner work hours out of 327 partner hours worked).

Notwithstanding this inconsistency, plaintiffs' decision to pursue this theory also will require a detailed review of the number of individuals on-site during the Store Manager's working hours.  Plaintiffs' own work schedules show that the number of partner hours worked each week while plaintiffs were physically on-site varied considerably due to a number of factors, including the number of partners on staff and available to work in the store, seasonal peaks in staffing, and the hours the Store Manager scheduled himself or herself to be in the store. Overton Tr. at 87:22-88:18, 271:12-274:4; *compare* Pendlebury Dep. Ex. 8 at 5/16/04 Schedule (reflecting plaintiff at store for 107.5 total partner work hours) *with* Overton Dep. Exhibit 2 at 4/4/04 Schedule (reflecting plaintiff at store for 90.25 total partner work hours).  These variances are further complicated by differences in size between plaintiffs' smaller stores and larger stores that have more partners working more hours per week, thereby increasing the likelihood that a Store Manager would physically supervise far more than 80 partner hours each week.  *See* Valdes Decl. ¶ 4.

---

[9] As with plaintiffs' "primary duty" argument, their "physically supervise" claim is legally irrelevant.  A supervisor is not required to "have physically supervised... [or] to 'eyeball' eighty man-hours of work per week to qualify for the 'executive' exemption."  *Sturm v. TOC Retail, Inc.,* 864 F. Supp. 1346, 1354 (M.D. Ga. 1994); *see also Baldwin*, 266 F.3d at 1117 ("The [plaintiffs'] continuous simultaneous physical presence with the assistant managers is not an essential requirement of supervision as long [as] the [plaintiffs] supervised the assistant managers' work in other ways.").

As with the application of their theory that they are not exempt based on the amount of time they spend on particular tasks, plaintiffs cannot establish that all Store Managers in South Florida, no less nationwide, are "similarly situated" under plaintiffs' theory that Store Managers did not supervise the equivalent of two or more employees.[10]

IV.     CONCLUSION

For the foregoing reasons, defendant Starbucks Corporation respectfully requests that plaintiffs' motion for court-facilitated notice be denied.[11]

Dated: September 14, 2004

Respectfully submitted,

By: _Kelly A. Cart_

Kelly-Ann G. Cartwright
Fla. Bar No. 892912
kcartwri@hklaw.com
Tiffani G. Lee
Fla. Bar No. 0132217
tlee@hklaw.com

---

[10] Although plaintiffs have not yet fully articulated all of their arguments, there are additional areas where it seems likely plaintiffs' legal theories will vary in application from Store Manager to Store Manager.  For instance, plaintiffs appear to argue that some Store Managers were not performing exempt management tasks because these tasks were delegated to Assistant Store Managers.  *See* Complaint ¶ 14; Pendlebury Tr. at 25:17-26:13.  Plaintiffs, however, do not have assistant managers.  Pendlebury Tr. at 25:17-26:13.  Similarly, plaintiffs have alleged in their verified complaint that they were subject to close supervision and had little discretion.  Complaint ¶¶ 13-14.  Plaintiffs have not introduced any evidence beyond conclusory declarations that the level of supervision by individual District Managers was uniform throughout the United States.  *See H & R Block v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (affidavits containing conclusory allegations insufficient factual support to establish that employees are "similarly situated" at notice stage).

[11] Because plaintiffs have not established that they are "similarly situated," defendants do not comment on the errors, inaccuracies, and deficiencies contained in their proposed notice form.  In the event the Court grants plaintiffs' motion, defendant requests that the parties meet and confer in an effort to resolve these issues without the need for Court intervention.  After conferring, the parties will file an amended notice with the Court identifying the remaining objections to the proposed notice, if any.

HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
(305) 374-8500
(305) 789-7799 (facsimile)

Daniel L. Nash
dnash@akingump.com
Catherine A. Conway
cconway@akingump.com

AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, D.C.  200036
(202) 887-4000
(202) 887-4288 (facsimile)

*Attorneys for Defendant Starbucks Corporation*

<u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that a true and correct copy of the foregoing Opposition to Plaintiffs' Motion for Court-Facilitated Notice was served by U.S. mail this 14th day of September, 2004, upon Daniel R. Levin, Esq., of the law firm of Shapiro, Blasi & Wasserman, P.A., Corporate Center at Boca Raton, 7777 Glades Road, Suite 110, Boca Raton, FL  33434.

By: _____

1

1
2          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
3          CASE NO. 04-80521-CIV-MARRA/SELTZER

4   SEAN PENDLEBURY and LAUREL
    OVERTON,
5
            Plaintiffs,
6
         vs.
7
    STARBUCKS COFFEE COMPANY,
8
            Defendant .
9   - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11                        One East Broward Boulevard
                          Ft. Lauderdale, Florida
12                        Monday, August 30, 2004
                          10:03 a.m.
13

14          VOLUME I (Pages 1 to 129)

15      VIDEOTAPE DEPOSITION OF LAUREL OVERTON

16

17          Taken on behalf of the Defendant

18   before LOIS E. GUFFEY, RDR, Notary Public in

19   and for the State of Florida at Large, pursuant

20   to a Notice of Taking Deposition filed in the

21   above cause.

22                                  **ORIGINAL**

23

24

25

FERNANDEZ & ASSOCIATES   (305) 374-886

EXHIBIT
/

13

1     Q.     When you were interviewing, did you

2   understand you were interviewing for a store

3   manager position?

4     A.     Yes.

5     Q.     Did you understand that you would be

6   placed in charge of a store if hired?

7          MR. LEVIN:  Object to the form.

8          THE WITNESS:  Yes.

9   BY MS. CONWAY:

10    Q.     Did you understand you would be the most

11  senior person at the store if you were hired?

12    A.     Yes.

13    Q.     At the time that you were interviewing

14  with Vicky, did you understand the specific store

15  that you would be hired into?  I mean was a

16  specific store discussed with you?

17    A.     No.

18    Q.     So you understood that you were going to

19  be hired as a store manager to be in charge of a

20  store, but you didn't know which store it would be;

21  is that correct?

22    A.     Yes.

23    Q.     Did you also understand that you would

24  have to have some training prior to being placed in

25  a store?

15

1      Q.   Do they call that immersion?  Have you

2  ever heard that term Starbucks uses?

3      A.   I don't know.

4      Q.   Okay.   What store did you do your

5  training at?

6      A.   Dixie Ludlam 8238.

7      Q.   Who was the store manager there?

8      A.   Kim Broyle.

9      Q.   Did Kim do -- actively assist you in your

10  training?

11      A.   No.

12      Q.   Okay.  How do you go about your training?

13  You just spend two weeks as a barista?

14      A.   Yes.

15      Q.   And as a barista did you learn what a

16  barista should be doing in the store?

17      A.   Yes.

18      Q.   Did you spend two weeks as a shift

19  supervisor?

20      A.   Yes.

21      Q.   Did you think in that two-week period that

22  you acted as a shift supervisor you came to

23  understand what a shift supervisor's role was?

24      A.   Yes.

25      Q.   Do you feel that you knew enough about the

```
 1   shift supervisor's role after two weeks that you
 2   would be able to lead and train a shift supervisor
 3   in your own store?
 4            MR. LEVIN:  Object to the form.
 5            THE WITNESS:  Yes.
 6   BY MS. CONWAY:
 7       Q.   Did you also spend the two weeks with the
 8   assistant manager role?
 9       A.   Yes.
10       Q.   Have you ever had an assistant manager
11   role?
12       A.   No.
13       Q.   And did you understand that at a certain
14   point, in reference to store volume, you would get
15   an assistant manager?
16       A.   Yes.
17       Q.   And have you ever gotten to that point in
18   volume?
19       A.   No.
20       Q.   Do you have any understanding as to
21   whether your store is getting to the point that it
22   will get an assistant manager?
23            MR. LEVIN:  Object to the form.
24   BY MS. CONWAY:
25       Q.   In reference to volume.
```

21

1      Q.    Did you have any questions about what your

2  leadership role would be as a store manager?

3      A.    Yes.

4      Q.    And what kind of questions did you have

5  about that?

6      A.    How to describe or encourage associates to

7  partake in a contest.

8      Q.    Okay.  Any other questions you had about

9  your leadership role?

10     A.    What it took to actually get the job done.

11     Q.    What response did you get from Kim about

12  that?  Strike that.  Did you have ask Kim about --

13  a question about what it actually took to get the

14  job done?

15     A.    Yes.

16     Q.    What did she respond?

17     A.    I don't recall.

18     Q.    Any other questions you had in reference

19  to your leadership responsibilities?

20     A.    I don't recall.

21     Q.    Did you understand from looking at the

22  handbook that you would have training

23  responsibilities?

24     A.    Yes.

25     Q.    And did you understand that it was your

22

1    responsibility as store manager that you would

2    train the baristas working for you?

3        A.   Yes.

4        Q.   And that you would also train your shift

5    supervisors; did you understand that?

6        A.   Yes.

7        Q.   Did you also understand that you would be

8    responsible for the recruiting in your store?

9        A.   Yes.

10       Q.   Did you also understand that you would be

11   responsible for disciplining any barista in your

12   store?

13       A.   Yes.

14       Q.   Did you also understand, as store manager,

15   that you would be responsible for disciplining a

16   shift supervisor in your store?

17       A.   Yes.

18       Q.   Did you also understand that you would be

19   responsible for -- as store manager, for looking

20   into promotions?

21       A.   Yes.

22            MR. LEVIN:  Object to the form.

23   BY MS. CONWAY:

24       Q.   Did you also understand that you would be

25   responsible for targeting certain baristas for

23

1   promotion to shift supervisor?

2           MR. LEVIN:  Object to the form.

3           THE WITNESS:  Yes.

4   BY MS. CONWAY:

5       Q.   Did you also understand as store manager

6   that you would also be responsible for the

7   evaluations and review of all of the employees

8   working in your store?

9       A.   Yes.

10      Q.   Did you also understand as store manager

11  for Starbucks that you would be responsible for

12  disciplinary actions, including corrective actions?

13      A.   Yes.

14      Q.   And as a store manager for the last

15  two years have you done corrective actions?

16      A.   Yes.  With guidance.

17      Q.   Okay.  Well, I am asking what role you've

18  had with corrective actions.  Have you done

19  corrective actions?

20      A.   Yes.

21      Q.   And how many corrective actions do you

22  think you have done?

23      A.   Approximately five.

24      Q.   That's all that you can remember over the

25  last two years?

27

1    if it's a barista, that they get a fair and

2    accurate evaluation; is that correct?

3         A.    Yes.

4              MR. LEVIN:  Object to the form.

5    BY MS. CONWAY:

6         Q.    And as store manager that is your sole

7    responsibility?

8              MR. LEVIN:  Object to the form.

9              THE WITNESS:  What do you mean by sole

10        responsibility?

11   BY MS. CONWAY:

12        Q.    Well, you are the one that's responsible

13   at your store location for making sure the

14   evaluation is fair and accurate?

15             MR. LEVIN:  Object to the form.

16             THE WITNESS:  Correct.

17   BY MS. CONWAY:

18        Q.    While at the store and as store manager

19   you are also the one that's responsible for

20   observing how the baristas are doing their job when

21   you are working; is that correct?

22        A.    Yes.

23        Q.    And would you agree that's a constant

24   observation that you have?

25             MR. LEVIN:  Object to the form.

28

```
 1              THE WITNESS:  Yes.
 2    BY MS. CONWAY:
 3        Q.    So if you are in the front of the store,
 4    you are constantly looking at the baristas to make
 5    sure they are properly performing their jobs?
 6              MR. LEVIN:  Object to the form.
 7              THE WITNESS:  Yes.
 8    BY MS. CONWAY:
 9        Q.    And that would be true even if the shift
10    supervisor happens to be working at the same time;
11    you would be looking at how the shift supervisors
12    were also performing their job; is that correct?
13              MR. LEVIN:  Object to the form.
14              THE WITNESS:  Yes.
15    BY MS. CONWAY:
16        Q.    And that would also be a constant effort
17    on your part to make sure that's happening?
18              MR. LEVIN:  Same objection.
19              THE WITNESS:  Yes.
20    BY MS. CONWAY:
21        Q.    And you are trained to do that.  You are
22    trained to, while you are on the floor, you are
23    monitoring and you are observing your subordinates;
24    is that correct?
25              MR. LEVIN:  Object to the form.
```

1          THE WITNESS:  Yes.

2    BY MS. CONWAY:

3        Q.   And so that would be -- whenever you are

4    in the store, that's what you are doing?

5          MR. LEVIN:  Object to the form.

6          THE WITNESS:  Yes.

7    BY MS. CONWAY:

8        Q.   Does it become a second nature to be

9    observing and making sure they are doing it the

10   right way?

11         MR. LEVIN:  Same objection.

12         THE WITNESS:  Yes.

13   BY MS. CONWAY:

14       Q.   And in observing and monitoring what your

15   baristas are doing you are making sure they are

16   making the quality drink that Starbucks expects; is

17   that correct?

18         MR. LEVIN:  Object to the form.

19         THE WITNESS:  Yes.

20   BY MS. CONWAY:

21       Q.   That they are -- also you are monitoring

22   and making sure they're being courteous, exhibiting

23   courtesy towards our customers; is that correct?

24         MR. LEVIN:  Same objection.

25         THE WITNESS:  Yes.

1  BY MS. CONWAY:

2      Q.   You are making sure that they are actively

3  making sure that the store is clean?

4          MR. LEVIN:  Object to the form.

5          THE WITNESS:  Yes.

6  BY MS. CONWAY:

7      Q.   That you're actively making sure that they

8  are acting in a safe manner; is that correct?

9          MR. LEVIN:  Object to the form.

10         THE WITNESS:  Yes.

11 BY MS. CONWAY:

12     Q.   In fact, Starbucks has a whole list of the

13 way we want our baristas to act, and you are making

14 sure they are doing that; is that correct?

15         MR. LEVIN:  Object to the form.

16         THE WITNESS:  Yes.

17 BY MS. CONWAY:

18     Q.   Do you feel at the end of the day that

19 you're responsible for the way the store looks?

20         MR. LEVIN:  Object to the form.

21         THE WITNESS:  Yes.

22 BY MS. CONWAY:

23     Q.   And at the end of the day do you feel as

24 store manager you are responsible for the delivery

25 of the best possible customer service?

31

```
 1              MR. LEVIN:  Object to the form.
 2              THE WITNESS:  Yes.
 3   BY MS. CONWAY:
 4       Q.   And to do that your baristas and shift
 5   supervisors have to deliver service that you think
 6   is appropriate; is that correct?
 7              MR. LEVIN:  Object to the form.
 8              THE WITNESS:  That I think or Starbucks
 9        requires?
10   BY MS. CONWAY:
11       Q.   Well, that Starbucks requires and you, as
12   store manager, want to insure is the best?
13              MR. LEVIN:  Object to the form.
14              THE WITNESS:  Yes.
15   BY MS. CONWAY:
16       Q.   Is that correct?
17       A.   Yes.
18       Q.   What was the first store that you worked
19   at?
20       A.   The Falls Mall.
21       Q.   How long did you work there?
22       A.   One month.
23       Q.   Next store?
24       A.   Holmberg.
25       Q.   How long were you at Holmberg?
```

32

1     A.     14 months.

2     Q.     When at Holmberg, how many employees did

3  you have?   How many partners reported to you?

4     A.     10 to 15.

5     Q.     The 10 to 15, what was the breakdown

6  between baristas and shift supervisors?

7     A.     It varies at different points.

8     Q.     At the beginning of your stint was it ten?

9     A.     Yes.

10    Q.     When you first started did you have two

11 shift supervisors, three supervisors?   How many

12 shift supervisors?

13    A.     One.

14    Q.     And what was the name that of shift

15 supervisor; do you recall?

16    A.     Scott Spangler.

17    Q.     Did you hire Scott?

18    A.     No.

19    Q.     Scott was already in place as a shift

20 supervisor?

21    A.     Yes.

22    Q.     So it was Scott and nine baristas; is that

23 correct?

24    A.     Yes.

25    Q.     Did you have weekly meetings with Scott

35

1      Q.    How much experience did Scott have, do you

2    know, prior to your supervising him?

3      A.    I don't recall.

4      Q.    When you started supervising Scott you

5    felt it was necessary to meet with him on a daily

6    basis so that he would know what to do?

7           MR. LEVIN:  Object to the form.

8           THE WITNESS:  Yes.

9    BY MS. CONWAY:

10     Q.    How long a period of time did you meet

11   with Scott on a daily basis to give him instruction

12   on what he should be doing?

13     A.    Minimum, half hour.

14     Q.    It was a minimum half hour a day?

15     A.    Yes.

16     Q.    Sometimes it was an hour?

17           MR. LEVIN:  Object to the form.

18           THE WITNESS:  Yes.

19   BY MS. CONWAY:

20     Q.    How long a period of time did this go on

21   that you met with Scott on a daily basis?

22     A.    One month.

23     Q.    And you did that because you thought, in

24   your experience, in your expertise, that that was

25   necessary; is that correct?

1      A.    Yes.

2      Q.    After the -- did you feel that you were

3    training Scott --

4      A.    Yes.

5      Q.    -- during this one-month period?

6            So did you give him feedback on how he was

7    doing on his training?

8      A.    Yes.

9      Q.    Did you give him daily feedback?

10     A.    Yes.

11     Q.    Did he improve during that month period on

12   what you expected him to do?

13     A.    Yes.

14     Q.    After the one-month period where you felt

15   you trained him to be a good shift supervisor, did

16   you then not meet with him as frequently?

17     A.    Yes.

18     Q.    How often did you meet with him after that

19   one-month period?

20     A.    Once a month.

21     Q.    In the process of training Scott to be a

22   shift supervisor were you also training baristas to

23   be -- to do the responsibilities of a barista?

24     A.    Yes.

25     Q.    How much time during that one month that

37

1  we are focusing on with Scott did you spend on

2  training baristas?  You kind of rolled your eyes so

3  I am having the feeling it was a long time.

4           MR. LEVIN:  Object to the form.

5           THE WITNESS:  Countless.

6  BY MS. CONWAY:

7      Q.    Countless hours?  Did you feel that the

8  baristas at the Holmberg location needed a lot of

9  training?

10     A.    Yes.

11     Q.    So you spent a lot of time doing that

12 training; is that correct?

13     A.    Yes.

14     Q.    During that initial time at Holmberg were

15 you also hiring a number of baristas?

16     A.    Yes.

17     Q.    And you were in charge of the recruitment

18 of those baristas; is that correct?

19     A.    Yes.

20           MR. LEVIN:  Object to the form.

21 BY MS. CONWAY:

22     Q.    And how did you go about recruiting

23 baristas at that Holmberg location?

24     A.    Through applications, phone interviews.

25     Q.    You were responsible for that?

38

1      A.   Yes.

2      Q.   Were you also responsible for getting

3  applications, you know, finding -- you know,

4  getting people to fill out applications?

5      A.   Yes.

6      Q.   Did you go to surrounding businesses to do

7  that?  How did you go about getting applications

8  filled?

9      A.   Through a fellow store, University Store

10  8281.

11      Q.   Who was the person at that store?

12      A.   John Thomas.

13      Q.   So was Mr. Thomas also a store manager?

14      A.   Yes.

15      Q.   Did you call Mr. Thomas up and say I need

16  your assistance?

17      A.   Yes.

18      Q.   Did Mr. Thomas provide you some

19  applications that he had?

20      A.   Yes.

21      Q.   Is it part of your responsibility as a

22  store manager to network with the other store

23  managers to see what information they might have

24  that would help you on the recruitment process?

25      A.   Yes.

1    Q.    What other things did you do to recruit

2  people?

3    A.    Had a hiring -- what do you call it?  An

4  open house.

5    Q.    How did you go about having an open house?

6    A.    I put up flyers in the store in Parkland,

7  and University and surrounding stores.  District

8  manager stores put them up on their cafe stations

9  in Lauderhill and posted the time and date of the

10  time of the open house.

11    Q.    So did you do the planning for this open

12  house yourself?

13    A.    Yes.

14    Q.    And did you determine which stores you

15  were going to put flyers in?

16        MR. LEVIN:  Object to the form.

17        THE WITNESS:  With guidance from district

18      manager.

19  BY MS. CONWAY:

20    Q.    Who was your district manager at the time?

21    A.    Jeanie Lyons.

22    Q.    Did you call Jeanie and ask her for

23  guidance as to where you should put the

24  applications?

25    A.    Yes.

```
 1      Q.    And did she give you suggests?

 2      A.    Yes.

 3      Q.    And did you follow those suggestions?

 4      A.    Yes.

 5      Q.    Okay.  And so she gave you suggestions as

 6  to where to put the flyers and you made sure the

 7  flyers went out; is that correct?

 8      A.    Yes.

 9      Q.    You said you had an open house?  Is that

10  the right terminology?

11      A.    Yes.

12      Q.    Do you recall approximately when this open

13  house that we are talking about was?

14      A.    It was before the store opened.

15  November 2002.

16      Q.    Who attended the open house?  You, as

17  store manager?

18      A.    Yes.

19      Q.    Who else was there?

20      A.    Just me.

21      Q.    Just you?

22      A.    (Witness nods head.)

23      Q.    And was the open house during normal store

24  hours --

25      A.    Yes.
```

41

1      Q.    -- or -- Okay.

2            Did you have a -- how many people showed

3      up?

4      A.    20 to 30.

5      Q.    What did you do or say during the open

6      house?  How did you handle 20 or 30 people showing

7      up?

8      A.    Mostly asked them basic questions, and

9      they just waited for me to finish with one person

10     to go to the next.

11     Q.    Did you have people fill out applications

12     during that process?

13     A.    Yes.

14     Q.    What kind of questions did you ask people?

15     A.    Starbucks has their set questions that

16     they have.  And I asked a few off those questions.

17     Q.    You said Starbucks has set questions.

18     There are a list of potential questions you could

19     ask; is that correct?

20     A.    Interview questions.

21           MR. LEVIN:  Object to the form.

22     BY MS. CONWAY:

23     Q.    And those interview questions -- there may

24     we 20 or 30 of those interviews questions; is that

25     correct?

42

1    A.    Correct.

2    Q.    And you chose which ones to use that would

3  help you in picking a good candidate; is that

4  correct?

5         MR. LEVIN:  Object to the form.

6         THE WITNESS:  Yes.

7  BY MS. CONWAY:

8    Q.    So you specifically asked questions that

9  you thought would be helpful in selecting who you

10  thought would be the best partner for your store;

11  is that correct?

12    A.    Yes.

13         MR. LEVIN:  Object to the form.

14  BY MS. CONWAY:

15    Q.    After having 20 to 30 people show up, did

16  you give any offers as a result of that open house?

17    A.    Yes.

18    Q.    How many offers did you give as a result

19  of that open house?

20    A.    Five.

21    Q.    Prior to giving offers, did you review

22  employment applications that were filled out by

23  those five people?

24    A.    Yes.

25    Q.    How many actual employment applications

43

1    did you get as a result of you having that open

2    house?

3        A.    I don't recall.

4        Q.    Okay.   But of however many you got, there

5    were five that you ended up narrowing down; is that

6    correct?

7        A.    Yes.

8        Q.    What were you looking for in a barista to

9    hire?

10       A.    Management experience, moving up in the

11   company.

12       Q.    When you selected the five, did you convey

13   offers to the five?

14       A.    Not at that point.

15       Q.    What -- what did you do after you selected

16   the five?

17       A.    I did background checks.

18       Q.    How did you go about making a background

19   check?

20       A.    I called their previous employers.

21       Q.    Anything else that you did to check the

22   five applicants out?

23       A.    And I called one of their references,

24   personal references.

25       Q.    After you called previous employers and

44

1   you called background checks what did you do next

2   in reference to hiring the five?

3      A.   I called them in and then offered it to

4   them.

5      Q.   So you did background check, you checked

6   with previous employers and then you called them

7   and made an offer; is that correct?

8      A.   Yes.

9      Q.   Am I leaving anything out in the process?

10     A.   No.

11     Q.   Did the five accept?

12     A.   Yes.

13     Q.   So once the five accepted, then how soon

14  after they accepted your offer of employment did

15  they start to work?

16     A.   A week.

17     Q.   Did you -- strike that.  I assume all five

18  had not worked for Starbucks before; is that

19  correct?

20          MR. LEVIN:  Object to the form.

21          THE WITNESS:  Yes.

22  BY MS. CONWAY:

23     Q.   And when they started to work, then you

24  had to train each of the five; is that correct?

25     A.   Yes.

45

1      Q.    Do you recall what you did to train the

2   five new employees?

3      A.    Had orientation with them, filled out

4   their paperwork.  They went to Starbucks experience

5   class.  And then they did their modules, and I had

6   them train in the University Store and the

7   Lauderhill store.  The University Store, because it

8   was busy, and the Lauderhill store to get the

9   experience of the bar.

10     Q.    The reason you were having them train in

11  other stores is your store wasn't open yet; is that

12  correct?

13     A.    Correct.

14           MR. LEVIN:   Object to the form.

15  BY MS. CONWAY:

16     Q.    But you did the orientation before they

17  went to the training classes; is that correct?

18     A.    Yes.

19     Q.    How long did orientation last?

20     A.    About five hours.

21     Q.    What type of things did you orient them

22  with?

23     A.    We filled out paperwork, went through the

24  new hire partner book, workbook, highlighted a few

25  things in that.  We did the first three modules,

46

1    the cafe station, whole bev, and the drip and

2    coffee.

3        Q.    During this five-hour orientation were all

4    five in the room with you or did you do them

5    separately?

6        A.    All five together.

7        Q.    Okay.  And you led the training; is that

8    correct?

9        A.    Yes.

10       Q.    You answered any questions they had; is

11   that correct?

12       A.    Yes.

13       Q.    And you made sure that they went through

14   the modules that they were required to go through;

15   is that correct?

16       A.    Yes.

17       Q.    How soon after you did the orientation did

18   they start working, the five start actually working

19   at the Holmberg store?

20       A.    One month.

21       Q.    When you sent them off to the other two

22   stores to do training, did you go by those stores

23   to see how their training was going?

24       A.    Yes.

25       Q.    And did you ask them how it was going?

1      A.    Yes.

2      Q.    Did you observe them in the two stores to

3  see how they were doing?

4      A.    Yes.

5      Q.    And was that part of your responsibilities

6  as store manager to make sure if they were getting

7  the proper training?

8      A.    Yes.

9      Q.    And do you feel as store manager that you

10  are responsible to make sure they are trained

11  properly?

12      A.    Yes.

13          MR. LEVIN:   Object to the form.

14  BY MS. CONWAY:

15      Q.    And that's true today that your baristas

16  must be trained properly; is that correct?

17          MR. LEVIN:   Object to the form.

18          THE WITNESS:   Yes.

19  BY MS. CONWAY:

20      Q.    And that's your responsibility?

21      A.    Yes.

22          MR. LEVIN:   Object to the form.

23  BY MS. CONWAY:

24      Q.    What was the official open date of the

25  Holmberg store if you recall?

50

1      A.    From a week before I opened until about

2    two weeks after I opened.

3      Q.    Okay.   Was that a manager to assist you

4    in the opening process?

5      A.    Yes.

6      Q.    And that was their purpose?   It was just

7    to help in reference to the opening process; is

8    that correct?

9           MR. LEVIN:   Object to the form.

10           THE WITNESS:   Until we were able to get

11      another shift supervisor.

12   BY MS. CONWAY:

13      Q.    Okay.   Did the assistant manager serve the

14   shift supervisor role during that period of time?

15           MR. LEVIN:   Object to the form.

16           THE WITNESS:   Yes.

17   BY MS. CONWAY:

18      Q.    Okay.   While at Holmberg you were the

19   person solely responsible for doing all recruiting;

20   is that correct?

21           MR. LEVIN:   Object to the form.

22           THE WITNESS:   Yes.

23   BY MS. CONWAY:

24      Q.    And while at Holmberg you were the person

25   exclusively responsible for doing the training; is

```
 1    that correct?
 2               MR. LEVIN:  Object to the form.
 3               THE WITNESS:  Yes.
 4    BY MS. CONWAY:
 5       Q.   Once the five were trained in the store,
 6    I -- is it correct that your training
 7    responsibilities didn't stop there?  You had
 8    continuing training?
 9       A.   Correct.
10       Q.   In fact, is it true that a barista is
11    always being trained?  Is that an accurate
12    statement?
13       A.   Yes.
14       Q.   And you are always training the baristas;
15    is that correct?
16               MR. LEVIN:  Object to the form.
17               THE WITNESS:  Yes.
18    BY MS. CONWAY:
19       Q.   Would it be a correct statement that a
20    store manager's training responsibilities are
21    continuing --
22               MR. LEVIN:  Object to the form.
23               THE WITNESS:  Yes.
24    BY MS. CONWAY:
25       Q.   --day to day?
```

52

1          Do you continue to train the baristas in

2    your store that you currently have?

3          MR. LEVIN:  Object to the form.

4          THE WITNESS:  Yes.

5    BY MS. CONWAY:

6        Q.    And that's regardless whether it's a

7    barista that is brand new or a barista that's been

8    with the Starbucks for 10 years; is that correct?

9          MR. LEVIN:  Object to the form.

10          THE WITNESS:  Yes.

11    BY MS. CONWAY:

12        Q.    Going back to complete the recruiting

13    process, have there been times that you have spent

14    more time on recruiting versus others or is it

15    consistent that you are always recruiting?  Are

16    there times that you have peaks?  I am just trying

17    to get a feel for --

18        A.    I am always recruiting.

19        Q.    Okay.  So on a weekly basis, you are

20    looking at applications; is that correct?

21        A.    Yes.

22        Q.    On a weekly basis you are trying to figure

23    out if there is a barista that you can hire?

24        A.    Yes.

25        Q.    How much of a time commitment is it on a

53

1   weekly basis, your recruiting?

2       A.   I look at applications every week and do

3   an interview at least every other week.

4       Q.   So is it a one to two hour thing?

5       A.   Yes.

6       Q.   On a weekly basis?

7       A.   Yes.

8       Q.   And I assume if you have a lot of

9   departures, whether you have terminated someone or

10  if someone has voluntarily left that time will

11  expand; is that correct?

12      A.   Yes.

13      Q.   For instance, the time you were hiring

14  five people it was more than one to two hours a

15  week; is that correct?

16      A.   Yes.

17      Q.   And because you are the store manager and

18  the person that is in charge of the store, you

19  don't have any assistants on that recruiting

20  function; is that correct?

21           MR. LEVIN:  Object to the form.

22           THE WITNESS:  Ask that question again.

23  BY MS. CONWAY:

24      Q.   Because you're the store manager and the

25  only person that's in charge of the store, you

54

1   don't have anyone that you can delegate the

2   recruiting function to; is that correct?

3           MR. LEVIN:  Object to the form.

4           THE WITNESS:  No.

5   BY MS. CONWAY:

6       Q.    That's correct?

7       A.    No.

8       Q.    Who can you delegate it to?

9       A.    Shift supervisors do a -- on the spot

10  question to give me kind of a background on what

11  they see in that person, because they have to work

12  with them as well.

13      Q.    Okay.  So you have the shift supervisor

14  give you input; is that correct?

15      A.    Yes.

16      Q.    But the ultimate decision is yours; is

17  that correct?

18          MR. LEVIN:  Object to the form.

19          THE WITNESS:  Yes.

20  BY MS. CONWAY:

21      Q.    So although you get input from a shift

22  supervisor you're the one that ultimately decides

23  who will be hired at your store?

24      A.    Yes..

25      Q.    When a partner is not working out are you

1   the one that ultimately decides to give corrective

2   action to that partner?

3           MR. LEVIN:  Object to the form.

4           THE WITNESS:  I team with my district

5       manager.

6   BY MS. CONWAY:

7       Q.   Can you think of any instance where you

8   have given a corrective action where you didn't

9   team with your district manager?

10      A.   No.

11      Q.   Okay.  And in teaming with your district

12  manager you go to the district manager and discuss

13  with the district manager your decision to give a

14  corrective action plan; is that correct?

15          MR. LEVIN:  Object to the form.

16          THE WITNESS:  Yes.

17  BY MS. CONWAY:

18      Q.   And you get the district manager's input;

19  is that correct?

20      A.   Yes.

21      Q.   Can you think of any instance when you

22  have suggested a corrective action plan that your

23  district manager has not approved it?

24      A.   No.

25      Q.   Okay.  Can you think of any instance where

56

1    you have recommended that someone be terminated

2    that your district manager didn't approve it?

3        A.    I don't recall.

4        Q.    Okay.  And backing up, you say you team.

5    You're responsible for the store; is that correct?

6            MR. LEVIN:  Object to the form.

7            THE WITNESS:  Yes.

8    BY MS. CONWAY:

9        Q.    And letting the -- in letting the district

10   manager know that you are intending to terminate

11   someone, is -- you want her to know what's going on

12   in your store; is that correct?

13           MR. LEVIN:  Object to the form.

14           THE WITNESS:  Yes.

15   BY MS. CONWAY:

16       Q.    And so in letting her know for instance

17   that you are about to terminate someone it's so

18   that she knows what is going on in your store; is

19   that correct?

20           MR. LEVIN:  Object to the form.

21           THE WITNESS:  I haven't had to -- I mean

22       termination?

23   BY MS. CONWAY:

24       Q.    Yes.

25       A.    I really haven't had to terminate anybody

1   except for one person, on her direction, in the

2   store.

3        Q.   What's -- it's your testimony you have

4   only terminated one partner?

5        A.   Yes.

6        Q.   What partner was that?

7        A.   Leslie Klein.

8        Q.   Why was Leslie Klein terminated?

9        A.   Inappropriate behavior.

10        Q.   In reference to corrective action plans,

11   are you the source of coming up with the corrective

12   action plan?

13        A.   Yes.

14        Q.   And you make a determination to come up

15   with a corrective action plan; is that correct?

16             MR. LEVIN:  Object to the form.

17             THE WITNESS:  Can you rephrase that?

18   BY MS. CONWAY:

19        Q.   In coming up with a corrective action

20   plan, you base it on your observations of the

21   particular partner; is that correct?

22             MR. LEVIN:  Object to the form.

23             THE WITNESS:  Yes.

24   BY MS. CONWAY:

25        Q.   Day-to-day you are the one that observes

58

1    the partner; is that correct?

2        A.    Yes.

3        Q.    You are the one that determines that

4    somehow their performance is not up to Starbucks

5    standards; is that correct?

6        A.    Yes.

7        Q.    You make that decision; is that correct?

8            MR. LEVIN:   What decision?

9    BY MS. CONWAY:

10       Q.    That their performance is not up to

11   Starbucks' plan.

12       A.    Sometimes.

13       Q.    Pardon me?

14       A.    Sometimes.

15       Q.    In reference to -- we have been talking

16   about Holmberg.  In reference to coming up with

17   corrective action plans, has the way you come up

18   with those plans changed from being at Holmberg to

19   your current position at Via Addison?  Have you

20   changed the way you manage the store in any way?

21       A.    Yes.

22       Q.    Okay.  And how have you changed it?  In

23   reference to corrective action plans.

24       A.    I use the success profile for corrective

25   actions.

59

1    Q.   Okay.   And when did Starbucks institute

2  success profile?

3    A.   I don't recall.

4    Q.   Other than looking at the success profile,

5  you still make a determination whether a corrective

6  action plan is appropriate; is that correct?

7         MR. LEVIN:  Object to the form.

8         THE WITNESS:  Yes.

9  BY MS. CONWAY:

10    Q.   And in making that determination, the

11  entire time that you have worked at Starbucks it is

12  based on your observations of the partner; is that

13  correct?

14         MR. LEVIN:  Object to the form.

15         THE WITNESS:  Yes.

16  BY MS. CONWAY:

17    Q.   Based on what you feel is appropriate

18  behavior for that partner; is that correct?

19         MR. LEVIN:  Object to the form.

20         THE WITNESS:  Yes.

21  BY MS. CONWAY:

22    Q.   Based on the standards that you feel that

23  partner should be reaching; is that correct?

24         MR. LEVIN:  Object to the form.

25         THE WITNESS:  There is no feeling.

```
 1          Starbucks standards.  There is no feeling.  So
 2          if they're not following Starbucks' standards,
 3          then they're either verbally or written,
 4          counseling.
 5    BY MS. CONWAY:
 6          Q.   Well, as store manager you have to know
 7    Starbucks standards; is that correct?
 8          A.   Yes.
 9          Q.   And you have to know them better than
10    anyone else at the store; is that correct?
11               MR. LEVIN:  Object to the form.
12               THE WITNESS:  Yes.
13    BY MS. CONWAY:
14          Q.   And in knowing Starbucks standards, in a
15    store manager, you are the one that's responsible
16    for making sure that your partners live up to those
17    standards; is that correct?
18               MR. LEVIN:  Object to the form.
19               THE WITNESS:  Yes.
20    BY MS. CONWAY:
21          Q.   So as store manager, would you agree you
22    are the best one to know what standards are?
23               MR. LEVIN:  Object to the form.
24    BY MS. CONWAY:
25          Q.   In the store?
```

61

```
 1       A.    In the store?

 2       Q.    Yes.

 3       A.    Yes.

 4       Q.    So in instituting and enforcing Starbucks

 5  standards, that is your responsibility as store

 6  manager; is that correct?

 7             MR. LEVIN:  Object to the form.

 8             THE WITNESS:  Yes.

 9  BY MS. CONWAY:

10       Q.    That would be true the entire time you

11  have been a Starbucks store manager.

12       A.    Yes.

13       Q.    Okay.  During periods that you have had to

14  do heavy recruiting have there been weeks that

15  you've had to spend all week doing recruiting?

16       A.    Yes.

17       Q.    And by the way, what -- your current

18  status, are you doing a lot of recruiting right

19  now?

20       A.    Not a lot.  But I am hiring for our

21  business to grow now, yes.

22       Q.    How many people -- how many open positions

23  do you currently have?

24       A.    I don't even have -- I don't have any open

25  positions.
```

84

1          MR. LEVIN:  Object to the form.

2          THE WITNESS:  Yes.

3   BY MS. CONWAY:

4      Q.   And do you also use it to let the baristas

5   know, for instance, when the schedule is going to

6   be posted?

7          MR. LEVIN:  Object to the form.

8          THE WITNESS:  Yes.

9   BY MS. CONWAY:

10     Q.   Let's talk about the schedule for a few

11  minutes.  The entire time that you have worked for

12  Starbucks have you made the schedules for the

13  stores that you have been responsible for?

14     A.   Yes.

15     Q.   And that is the store manager

16  responsibility; is that correct?

17     A.   And the assistant store manager,

18  assistant manager responsibility.

19     Q.   Okay.  Well, for purposes of these

20  questions, since you have never been an assistant

21  manager and other than the short period of time

22  that you had an assistant manager, I want you to

23  tell me your knowledge in reference to your stores

24  that you have managed, okay?

25     A.   Okay.

85

1       Q.    So when you have been in charge of a

2    store, has it been your responsibility to do the

3    schedule?

4       A.    Yes.

5       Q.    And in fact, the entire time you worked

6    for Starbucks you have made schedule; is that

7    correct?

8       A.    Yes.

9       Q.    There is a scheduling system at the store;

10   is that correct?

11      A.    Yes.

12      Q.    And that's called ALS?  Is that what you

13   call it?

14      A.    Staff works.

15      Q.    Staff works.  Okay.  You are a store

16   manager responsible for making a schedule every

17   week; is that correct?

18      A.    Yes.

19      Q.    And every week -- when is that schedule

20   supposed to be posted?

21      A.    Wednesday by close of business.

22      Q.    Do you always manage to make that

23   Wednesday by the close of business?

24      A.    No.

25      Q.    Because it takes a long time to make a

86

1   schedule?

2       A.    Yes.

3       Q.    How long does it usually take you to make

4   a good schedule?

5       A.    About -- it has decreased over the time

6   that I started with Starbucks.  Started at eight

7   hours and have decreased it down to about three

8   hours.

9       Q.    So initially when you started at Starbucks

10  it would take you eight hours to make the schedule?

11      A.    Yes.

12      Q.    And even after making a schedule you make

13  changes; is that correct?

14      A.    Before it was posted, yes.

15      Q.    Yes.  Now it takes you about three hours a

16  week to make a schedule?

17      A.    Yes.

18      Q.    And the reason it takes three hours a week

19  to make a schedule is you have to take into

20  consideration, as store manager, people's

21  availability; is that correct?

22          MR. LEVIN:  Object to the form.

23          THE WITNESS:  Yes.

24  BY MS. CONWAY:

25      Q.    You have to consider as store manager who

89

1    the schedule; is that correct?

2          MR. LEVIN:  Object to the form.

3          THE WITNESS:  Staff works builds the

4       schedule.

5    BY MS. CONWAY:

6       Q.   But with -- staff works spits out a

7    proposed schedule; is that correct?

8          MR. LEVIN:  Object to the form.

9          THE WITNESS:  Yes.

10   BY MS. CONWAY:

11      Q.   But the ultimate schedule that you post,

12   you put input into; is that correct?

13      A.   Yes.

14      Q.   Okay.  So that's why I am saying you build

15   the schedule.  So that we are on the same page.

16   The schedule that you post, that you put your input

17   to --

18      A.   Uh-huh.  Yes.

19      Q.   -- you have taken into consideration, for

20   instance, baristas -- individual barista requests?

21      A.   That's already built into the schedule

22   through staff works.

23      Q.   Because you have inputted that

24   information?

25      A.   Yes.

94

1      A.    We have a reporting menu that has store

2   daily, store weekly reports that I review and shift

3   supervisors review.

4      Q.    Right now I am just asking about your

5   review.  Do you look at the daily reports on a

6   daily basis?

7      A.    Every time I work, yes.

8      Q.    Okay.  And do you look at the weekly

9   reports?

10     A.    Yes.

11     Q.    On a daily basis?

12     A.    Yes.

13     Q.    Do you, on Mondays tend to spend time on

14  administrative duties?

15     A.    Yes.

16     Q.    And do you spend the full Monday on your

17  administrative duties?

18     A.    90 percent of the time, yes.

19     Q.    Okay.  And what are some of the

20  administrative duties that you cover on a Monday?

21     A.    I do interviews.  I prepare a weekly

22  packet.  I prepare a fax document to the district

23  manager.  I prepare a weekly e-mail to the district

24  manager.  Have shift supervisor meetings.  Have

25  first impressions with new hires.  Go over the

95

1   store reports.  Go over the pastry reports.
2   Seattle reports.  Spend time with my shift
3   supervisors on training and prepare for new hires.
4   Go through files, personnel files.  Set up the
5   communications board.  Organize the back room.
6   That's some of the things I recall at this time.
7        Q.   Do you use Monday in order to plan your
8   week?
9        A.   Yes.
10        Q.   And do you also use it to organize what
11   will be transpiring at the store that week?
12        A.   No.  That's done the previous week.
13        Q.   Okay.
14        A.   So it's work done for the following week.
15        Q.   Yeah, for the next week.  You organize
16   what will happen that next week in the store --
17        A.   Yes.
18        Q.   -- on Mondays?  Do you work on a schedule
19   on Monday?
20        A.   No.
21        Q.   When did you work on the schedule?
22        A.   Tuesday.
23        Q.   So the -- generally you work approximately
24   eight hours on Mondays?
25             MR. LEVIN:  Object to the form.

1           THE WITNESS:  Yes.

2    BY MS. CONWAY:

3        Q.    And that eight hours is spent doing

4    payroll, doing reports, organizing for the next

5    week?

6           MR. LEVIN:  Object to the form.

7    BY MS. CONWAY:

8        Q.    Is that correct?

9        A.    Yes.

10       Q.    Doing interviews; is that correct?

11          MR. LEVIN:  Object to the form.

12          THE WITNESS:  Yes.

13   BY MS. CONWAY:

14       Q.    Although I -- you also do interviews

15   throughout the week, depending on the applicant's

16   ability to come and meet with you; is that correct?

17          MR. LEVIN:  Object to the form.

18          THE WITNESS:  Yes.

19   BY MS. CONWAY:

20       Q.    You do shift supervisor meetings during

21   your Monday, eight hours; is that correct?

22       A.    Yes.

23       Q.    You utilize those eight hours to do

24   training; is that correct?

25       A.    Yes.

1       Q.    You utilize those eight hours to review a

2   number of reports; is that correct?

3       A.    Yes.

4             MR. LEVIN:   Object to the form.

5   BY MS. CONWAY:

6       Q.    Can you name some of the reports that you

7   are reviewing during the eight hours on Monday?

8       A.    Store weekly report.  Pastry mark outs.

9   The -- I go over the Seattle reports with my shift

10  supervisor.  Also look at drip reports, as well as

11  transfer reports.  Cash management log.  Key

12  performance measures.  P and L.  I think that's

13  about it.

14      Q.    It's not a test.  Don't worry.  If you

15  can't remember or you think of another report you

16  can let me know.  In reference to the weekly

17  reports that you mentioned looking at, why do you

18  look at the weekly reports?

19      A.    For our blended -- I mean our UPH for RTD

20  and bakery.  How many customer counts.  How much

21  revenue we do.  What our average food census is.

22      Q.    As store manager are you looking at those

23  reports so that you can make sure you have enough

24  inventory?

25            MR. LEVIN:   Object to the form.

98

1          THE WITNESS:   No.   To see our report card

2      for the week of what --

3  BY MS. CONWAY:

4      Q.   To see how you are doing on your -- the

5  bringing in revenue?

6      A.   Correct.   Yes.

7      Q.   As a store manager are you concerned about

8  bringing in your targeted revenue?

9      A.   Yes.

10      Q.   And are you, at the store, ultimately

11  responsible for making sure the revenue comes in?

12      A.   Yes.

13      Q.   And how about the mark out report, is that

14  to see if you're selling all the product that you

15  have in the store?

16      A.   The mark out report is used to make sure

17  that the pastries are being donated properly.   And

18  if we are ordering too much, I go over that report

19  with my pastry specialist, shift supervisor.

20      Q.   You have delegated the pastry ordering to

21  a shift supervisor; is that correct?

22      A.   Yes.

23      Q.   And you have delegated those

24  responsibilities to someone else to follow through

25  on a day-to-day basis; is that correct?

1    A.    Yes.

2    Q.    But you still review what that person has

3    done?

4    A.    Yes.

5    Q.    So even though you have delegated those

6    responsibilities, you understand as store manager

7    you are still ultimately going to be responsible to

8    you review what they do?

9          MR. LEVIN:  Object to the form.

10         THE WITNESS:  Yes.

11   BY MS. CONWAY:

12   Q.    And in reference to the pastry issue, if

13   you find that you are donating a lot of pastries to

14   charity, do you then try to cut back on the pastry

15   order?

16         MR. LEVIN:  Object to the form.

17         THE WITNESS:  I review that with the shift

18       supervisor, yes.

19   BY MS. CONWAY:

20   Q.    And do you give the shift supervisor

21   instructions in reference to cutting it back?

22   A.    Yes.

23   Q.    Okay.  And do you instruct the shift

24   supervisor that perhaps we are ordering too much

25   because we are making more donations than we should

100

1    be?

2        A.    Yes.   And vice versa.   They may not

3    ordering enough.

4        Q.    Okay.   So you also tell the shift

5    supervisor, listen, we are not making very many

6    donations, we must not be having enough for the

7    customers?

8        A.    Yes.

9        Q.    Okay.   And that is something you review on

10   a weekly basis?

11       A.    Yes.

12       Q.    Because, again, that hits your revenue; is

13   that correct?

14       A.    Yes.

15             MR. LEVIN:   Object to the form.

16   BY MS. CONWAY:

17       Q.    Seattle reports, how many Seattle reports

18   do you have to look at on Monday?

19       A.    Well, I have a shift supervisor in charge

20   of counting Seattle who goes and counts everything

21   in our store in order to find out what we need to

22   order.

23       Q.    Okay.   You don't actually physically,

24   yourself, go out and count it?   You have a shift

25   supervisor do that; is that correct?

101

1       A.    I do count it every once in awhile when

2   they are not there or not available, yes.

3       Q.    Okay.  But if they are there and available

4   they actually do the counting?

5       A.    Yes.

6       Q.    And then you look at the report that goes

7   out?

8       A.    Yes.

9       Q.    Okay.  Is that just one report that goes

10  to Seattle or is that a number of reports?

11      A.    Well, she fills out a report by hand and

12  then a transfer report is -- comes out of the

13  computer saying what we are ordering.

14      Q.    Okay.  And you review that to make sure

15  it's accurate?

16      A.    Yes, uh-huh.

17      Q.    Have there been occasions when a report

18  has come out saying we're ordering so much

19  frappuccino mix and you have decided it's not

20  enough and you change that?

21      A.    Yes.

22      Q.    And how frequently do you make changes to

23  the report that comes out of the computer?

24      A.    Probably once a month.

25      Q.    And you use your experience as a store

1  manager and your knowledge of your neighborhood to

2  increase or decrease the report?

3      A.   Yes.

4      Q.   Can you explain to me what a drip report

5  is?

6      A.   It's a report that we have to do for our

7  back of the house, the organization that we will be

8  doing.  The person in charge needs to know how many

9  drip items that we have, as well as how many

10 transfers go in and out of the building.

11     Q.   Now transfers are -- you have -- a store

12 manager calls you and says we're out of frappuccino

13 mix.  Can you send me some?  Is that a transfer?

14     A.   Yes.

15     Q.   Okay.  And you -- there's times that you

16 run out of something and you will call another

17 storer manager and say can you send me more milk?

18     A.   Yes.

19     Q.   So you -- somehow you utilize -- the drip

20 report has a notation about transfers that have

21 taken effect?

22     A.   No.  They're two separate reports.

23     Q.   Okay.  So in reviewing that transfer

24 report, as store manager, why do you care about the

25 transfers?

103

1          MR. LEVIN:  Object to the form.

2          THE WITNESS:  It's a tool that we have to

3      fill out for our back of the house meeting that

4      we have to organize our back rooms.  So that's

5      information that we have to put on the sheet,

6      as well as the invoices that we get in every

7      week.  So we have to write down for the drip

8      stations, drip coffee, plus the inventories

9      that go in and out, how much we spend, as well

10     as the invoices that come in and out and how

11     long it takes to process.  .

12  BY MS. CONWAY:

13     Q.   Do you look at all of the invoices that

14  come in and out?

15     A.   Yes.

16     Q.   And is part of the reason you are looking

17  at it to make sure they're accurate?

18     A.   Yes.

19     Q.   Okay.  And in reference to the invoices

20  that come in and out do you have a shift supervisor

21  do the actual counting and then you make sure that

22  it -- that they are right?

23     A.   Yes.

24     Q.   And that's been the case the entire time

25  you have been a store manager?

124

1          You have taken on responsibility to smell

2     coffee.  Have you delegated any of it to your shift

3     supervisors in reference to the training?

4          A.   Yes.

5          Q.   What have you delegated to the shift

6     supervisors?

7          A.   To look in their passports so -- they have

8     a little passport that they have to put this

9     information in.  To make sure that they are doing

10    it.

11         Q.   You mentioned inventory management as one

12    of your goals.  Is that correct?

13         A.   Yes.

14         Q.   What do you mean by that?

15         A.   Before I got to the store they would just

16    order whatever they saw, sight wise, that they were

17    out of versus counting the inventory and finding

18    out how much we go through a week.

19         Q.   So you put more analysis into it?

20         A.   Yes.

21         Q..  And so now as store manager you analyze

22    numbers to figure out what inventory should be

23    ordered; is that correct?

24              MR. LEVIN:  Object to the form.

25              THE WITNESS:  Yes.

197

1    managers that have discussed different ways of

2    running their stores?

3         A.    Yes.

4         Q.    And what other managers for instance in

5    your district run their stores in a different

6    manner?

7         A.    Everyone runs their store differently.

8         Q.    They run their store how they want to run

9    it?

10        A.    Yes.

11        Q.    All right.  And so -- and that's pursuant

12   to the individual manner in which the store manager

13   wants to run their store; is that correct?   In

14   their individual personality.

15             MR. LEVIN:  Object to the form.

16             THE WITNESS:  Yes.

17   BY MS. CONWAY:

18        Q.    Would it be true to say that unless you

19   have been in the store and observed it you wouldn't

20   know how an individual store was being run?

21             MR. LEVIN:  Object to the form.

22             THE WITNESS:  Correct.

23   BY MS. CONWAY:

24        Q.    In reference to Michael Seda, have you

25   ever given him a verbal warning?

1      A.   The weekly labor recap.

2      Q.   Okay.  So you look at the weekly labor

3   recap, and you took information from that, and you

4   put it on the schedule so you could see what your

5   goals were?

6      A.   Yes.

7      Q.   And then you try to beat that goal?

8      A.   Yes.

9      Q.   Okay.  And this shows a total scheduled

10   hours of 323 hours, point 75; is that correct?

11      A.   Yes.

12      Q.   And those are the actual hours that

13   your -- no.  Strike that.  Those are the hours that

14   you forecasted that you would need to run your

15   store that week; is that correct?

16      A.   Yes.

17      Q.   And in fact, you came over that forecast;

18   is that correct or --

19      A.   I don't know.  I don't have --

20      Q.   No?

21      A.   -- that calculation.

22      Q.   So you didn't calculate the handwritten

23   versus the --

24      A.   No, I don't.

25      Q.   Do you know -- one thing Monday that you

273

1     A.    Yeah.   It's one of Jeanie's phrases.

2     Q.    Okay.   It's not your phrase?

3     A.    No.

4     Q.    But you put it on your schedule to

5  incentivise your team?

6     A.    Yes.

7     Q.    And you also -- it looks like it says,

8  "sell, sell, sell"?

9     A.    Yes.

10    Q.    And was that to get your team to sell?

11    A.    Yes.

12    Q.    Are there peaks and valleys at any store

13  in reference to seasonality to the sales?

14          MR. LEVIN:   Object to the form.

15          THE WITNESS:   Yes.

16  BY MS. CONWAY:

17    Q.    Okay.   And is Christmas usually a high

18  season?

19    A.    Second high season.

20    Q.    Okay.   What's your highest season?

21    A.    Spring.

22    Q.    Okay.   And is that true both at Holmberg

23  and Via Addison or are they different seasons,

24  depending on the store?

25    A.    It's different seasons.

FERNANDEZ & ASSOCIATES   (305) 374-8868

274

1      Q.     Depending on the store?

2      A.     Yes.

3      Q.     Each store has a unique aspect to it?

4      A.     Yes.

5      Q.     Okay.  Have you had contact with other

6  store managers in reference to the lawsuit that is

7  pending?

8      A.     Yes.

9      Q.     Okay.  And what store managers have you

10  contacted in reference to this lawsuit?

11         MR. LEVIN:  I am sorry.  Can you repeat

12      or -- well, hold that thought.  Object to the

13      form.

14  BY MS. CONWAY:

15      Q.     Go ahead.

16         MR. LEVIN:  Good management over here.

17         THE WITNESS:  Steve Tullick.  Amy Gross.

18      Jeff Grushka, G-R-U-S-H-K-A.  Eli.  I don't

19      know his last name.  That's all I can recall at

20      this moment.

21  BY MS. CONWAY:

22      Q.     When did you contact Steve?

23         MR. LEVIN:  Object to the form.

24         THE WITNESS:  I don't recall.

25  BY MS. CONWAY:

277

1    Q.    Do you know if he did?

2    A.    Not that I recall.

3    Q.    Okay.  And so it's your understanding that

4    you -- in order to be exempt, that you have to

5    supervise two full-time employees or four part-time

6    employees?

7    A.    When I am present in the building, yes.

8    Q.    So it is your understanding that if you

9    were not present in the building while you had two

10   full-time employees working for you that you should

11   be given overtime and be treated as nonexempt?

12          MR. LEVIN:  Object to the form.

13          THE WITNESS:  Correct.

14   BY MS. CONWAY:

15   Q.    And it is also your understanding that you

16   could -- while you were present in the building you

17   could have four part-time employees, and if you had

18   four part-time employees then you should be exempt;

19   is that correct?

20          MR. LEVIN:  Object to the form.

21          THE WITNESS:  Correct.

22   BY MS. CONWAY:

23   Q.    How did you come to that understanding?

24   A.    Through the Fair Labor Act law.

25   Q.    Have you read the law?

278

1    A.    Yes.

2    Q.    When did you read the law?

3    A.    Two months ago.

4    Q.    So your understanding of whether you

5    should be exempt or nonexempt is based on your

6    reading of the Fair Labor Standards Act?

7    A.    Correct.

8    Q.    Anything else that you understand from

9    your reading of the Fair Labor Standards Act in

10   reference to how you should be classified?

11        MR. LEVIN:  Object to the form.

12        THE WITNESS:  I don't recall at this

13     moment.

14   BY MS. CONWAY:

15   Q.    Nothing that you can think of as you sit

16   here?

17   A.    I don't recall.

18   Q.    And I just want to make sure I understand

19   this.  It's your understanding that you have to be

20   in the building actually supervising the employees

21   in order for it to count as being supervision of

22   two full-time equivalent employees; is that

23   correct?

24        MR. LEVIN:  Object to the form.

25        THE WITNESS:  Correct.

279

1    BY MS. CONWAY:

2        Q.   What did you say in reference to Amy?

3    What conversation did you have with Amy?

4        A.   Amy had asked me how everything was going

5    and I said fine.  She goes:  "Are you being treated

6    any differently?"  And I said, "On occasion."  And

7    she didn't go into elaborate.  I said if she had

8    any questions she could speak to my lawyer, Daniel

9    Levin.

10       Q.   Did you tell her anything else about the

11   lawsuit?

12       A.   No, I did not.

13       Q.   Did you tell her about your understanding

14   of the Fair Labor Standards Act?

15       A.   No, I did not.

16       Q.   When did you have this conversation with

17   Amy?

18       A.   In May.

19       Q.   Is Amy your current store manager?

20       A.   Yes.

21       Q.   Where is she?

22       A.   She was at 1615 North Federal.

23       Q.   Do you know if she's had any conversations

24   with your lawyer?

25       A.   I do not know.



DEFENDANT'S EXHIBIT

2 for 1.0
LG 2-30-04

# StaffWorks™
The Intelligent Labor Scheduler

## VIA ADDISON
Week Ending 06/20/04

| EMPLOYEE NAME | MONDAY 06/14/04 | | TUESDAY 06/15/04 | | WEDNESDAY 06/16/04 | | THURSDAY 06/17/04 | | FRIDAY 06/18/04 | | SATURDAY 06/19/04 | | SUNDAY 06/20/04 | | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | |

*Handwritten schedule grid — individual cell entries are illegible handwriting.*

# Staff Works™
The Intelligent Labor Scheduler

## VIA × DISON
### Week Ending 04/04/04

*(Handwritten top-right: Budget $141C)*

*Page 1 — Printed 4/7/xx*

| EMPLOYEE NAME | MONDAY 03/29/04 SHIFT / HRS | TUESDAY 03/30/04 SHIFT / HRS | WEDNESDAY 03/31/04 SHIFT / HRS | THURSDAY 04/01/04 SHIFT / HRS | FRIDAY 04/02/04 SHIFT / HRS | SATURDAY 04/03/04 SHIFT / HRS | SUNDAY 04/04/04 SHIFT / HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|
| Z-PHANTOM3, Z-PHANT | U | 12:00P-5:00P 5.00 | U | U | | 12:00P-5:00P 5.00 | 1:45P-5:00P 3.15 | 17.75 |
| Z-PHANTOM4, Z-PHANT | U | 1:30P-10:00P 8.00 | U | U | 2:00P-10:30P | U | U | 15.00 |
| Overton, Laurel | 11:00A-6:00P 6.50 | 10:00A-11:00A 1.00 2:00P-10:00P 7.50 | 7:30A-12:00P 4.50 12:00P-4:00P 3.50 | 1:30P-10:00P 8.00 | | 8:00A-4:30P 8.00 | 7:30A-8:30P T 1.00 | 40.00 |
| Antonelli, Catherine | 2:00P-3:00P T 1.00 3:00P-10:00P | 2:00P-3:15P T 1.25 | 1:45P-10:00P 7.75 | U | 1:00P-10:00P 9.00 | 3:30P-10:30P 6.50 | 1:00P-9:30P 8.00 | 40.90 40.00 |
| Kelly, Angela | 6:00A-12:00P 5.50 12:00P-2:00P 2.00 | U | 6:00A-2:00P 7.50 | 6:00A-2:00P 7.50 | 6:00A-12:00P 6.00 | U | 6:30A-1:00P 6.00 | 41.15 34.50 |
| Lyn, Natalie | U | U | U | U | U | U | U | |
| R Roetzel, Deborah | 7:30A-12:30P 5.00 12:30P-1:30P 1.00 | 6:00A-2:00P 7.50 | 6:00A-2:00P 7.50 | | 6:00A-1:00P 6.50 | 6:30A-12:00P 5.50 | 6:30A-1:00P 6.00 | 35.3R 33.00 |
| Donahoe, Seth | 3:15P-10:00P 7.25 | 8:00A-4:30P 8.00 | 1:45P-6:45P 5.00 | 7:30A-4:00P 8.00 | U | U | U | 33.18 36.25 |
| Orestas, Giselle | U | U | U | U | U | U | U | |
| Principali, Kathleen | U | U | U | U | U | U | U | |
| R Sedo, Michael | U | U | 6:00P-10:00P 4.00 | 6:00P-10:00P 4.00 | U | U | 1:00P-9:00P | 8.03 8.00 |
| Selby, Ian | U | U | U | U | U | 2:00P-10:30P 8.00 | | 7.67 8.00 |
| Snyder, Alexander | 9:30A-5:00P 8.00 | | 12:15P-4:00P 3.75 | 1:45P-7:30P 5.75 | 11:15A-7:00P 7.25 | 6:30A-2:15P 7.25 | 6:30A-3:00P 8.00 | 35.52 40.00 |
| Vola, Deborah | 6:00A-2:30P 8.00 | 6:00A-2:30P 8.00 | | 6:00A-1:15P 6.75 | 7:30A-1:30P 6.00 | | 6:30A-3:00P | 32.04 28.75 |

*(Handwritten annotations in body area)*

| MANAGERS FORECAST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SPH | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 50.75 | DAILY 46.25 | DAILY 43.50 | DAILY 40.00 | DAILY 41.75 | DAILY 40.75 | DAILY 39.75 | DAILY 301.25 |
| | WK.TOTAL 50.75 | WK.TOTAL 97.00 | WK.TOTAL 140.50 | WK.TOTAL 180.50 | WK.TOTAL 222.25 | WK.TOTAL 262.50 | WK.TOTAL 301.25 | |
| SHIFT COVERAGE | 3 4 6 2 | 3 7 2 | 3 6 2 | 3 4 3 | 3 4 2 | 3 4 2 | 3 4 2 | |

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-80521-CIV-MARRA/SELTZER

SEAN PENDLEBURY and LAUREL OVERTON,

        Plaintiffs,

    vs.

STARBUCKS COFFEE COMPANY,

        Defendant .

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                            One East Broward Boulevard
                            Ft. Lauderdale, Florida
                            Tuesday, August 31, 2004
                            10:06 a.m.

VIDEOTAPE DEPOSITION OF SEAN PENDLEBURY

        Taken on behalf of the Defendant
before LOIS E. GUFFEY, RDR, Notary Public in
and for the State of Florida at Large, pursuant
to a Notice of Taking Deposition filed in the
above cause.

**ORIGINAL**

FERNANDEZ & ASSOCIATES  (305) 374-8868

EXHIBIT

2

27

```
1        A.    Yes.

2        Q.    Okay.  And so getting back to my question,

3   then, in the stores that you have worked in, the

4   store manager is the highest position in the store?

5              MR. LEVIN:  Object to the form.

6              THE WITNESS:  Yes.

7   BY MR. NASH:

8        Q.    And when you say considered, and when I

9   say highest what we are talking about is, as far as

10  the partners who work at the stores that you have

11  worked at, both the baristas and the shift

12  supervisors, they consider you to be the highest

13  person in the store, correct?

14             MR. LEVIN:  Object to the form.

15             THE WITNESS:  They consider me to be their

16       boss, yes.

17  BY MR. NASH:

18       Q.    Yes.  When did Jeanie Lyons become your

19  district manager?

20       A.    I would say officially at the beginning of

21  the new fiscal year, which starts in October for

22  us, of 2003.

23       Q.    Is there a reason why you are using the

24  word "officially"?

25       A.    We all go through -- when we go through
```

1      A.    (Witness nods head.)

2      Q.    First of all, let me ask you about how

3  many partners work at your current store.

4      A.    Currently there are 11 partners underneath

5  me.

6      Q.    And how many of those 11 are baristas?

7      A.    Seven.

8      Q.    And so four are shift supervisors?

9      A.    Yes.

10     Q.    Were you responsible for hiring any of

11  those 11?

12     A.    About half.

13     Q.    And were the others already there when you

14  got to the store?

15     A.    They were existing employees, yes.

16     Q.    So during the time that you have been at

17  the Shops of Boca have you been responsible for

18  hiring any of the new partners who have come to

19  that store?

20     A.    The majority of the time, yes.

21     Q.    And the partners that you have hired, did

22  that -- this has included both baristas and shift

23  supervisors?

24     A.    No.   The current supervisors that are

25  there have -- I hired.

30

1     Q.   They were all existing partners?

2     A.   They were either existing or they were

3 promoted.

4     Q.   And let me see if I can run through this

5 quickly.  We heard a lot of testimony yesterday

6 about recruiting and hiring at a Starbucks store.

7 Well, let me ask you this actually to see if I can

8 speed things up.  Would you -- would you agree that

9 the -- that the testimony we heard yesterday from

10 Ms. Overton accurately describes what a Starbucks

11 store manager does?

12         MR. LEVIN:  Object to the form.

13         THE WITNESS:  No.

14 BY MR. NASH:

15     Q.   You would not?

16     A.   I would not.

17     Q.   Your view of the responsibilities of a

18 Starbucks store manager is different than what Ms.

19 Overton testified to yesterday?

20     A.   I know the responsibility of a Starbucks

21 store manager are different than what my fellow

22 colleague said yesterday.

23     Q.   What you do as store manager at Starbucks

24 is different than what you heard Ms. Overton

25 testify that she does as a store manager at

1   Starbucks?

2           MR. LEVIN:  Object to the form.

3           THE WITNESS:  What I do at Starbucks as a

4       store manager is the same that all Starbucks

5       managers do.

6   BY MR. NASH:

7       Q.   But it's different than what Ms. Overton

8   does?

9           MR. LEVIN:  Object to the form.

10          THE WITNESS:  Yes.

11  BY MR. NASH:

12      Q.   Maybe you could help me out so he could go

13  through quickly.  Can you tell me some of the ways

14  that what you do as a store manager at Starbucks is

15  different than what you heard Ms. Overton say that

16  she does as a store manager?

17          MR. LEVIN:  Object to the form.

18          THE WITNESS:  Well, 80 percent of my time

19      is actually spent on the floor selling coffee,

20      wearing the green apron, making frappuccinos,

21      cleaning the bathrooms, stocking the pastry

22      case, cleaning the floors, wiping windows.  I

23      highly doubt that those are considered

24      managerial.

25  BY MR. NASH:

32

1      Q.   And so you believe that's different than

2   what you heard Overton testify yesterday?

3           MR. LEVIN:   Object to the form.

4           THE WITNESS:   Yes.

5   BY MR. NASH:

6      Q.   So I assume that means that you believe

7   she spends less than 80 percent her time as a store

8   manager doing the things that you just testified

9   about?

10          MR. LEVIN:   Object to the form.

11          THE WITNESS:   No.   I know she's spends the

12      exact same amount of time.

13   BY MR. NASH:

14      Q.   So then how is it different?   You just

15   said that the testimony was different than what you

16   do.

17      A.   I can't speculate on why she would say

18   that.

19          MR. LEVIN:   Object to the form.

20   BY MR. NASH:

21      Q.   I am not asking you to speculate.   You

22   just told me that you heard Ms. Overton, and your

23   view, based on listening carefully to her, is that

24   what you do as a store manager is different than

25   what Ms. Overton does.   I want you to tell me.   I

33

1    don't want you to speculate.  I want you to tell me

2    based on your experience what is different about

3    what you do as a store manager than what Ms.

4    Overton testified about.

5        A.    I know what Mr. Overton does basically

6    through personal conversations that I had with her,

7    being in her store and working with Ms. Overton,

8    which is -- would be the same as any personal

9    conversation that I would have with any other store

10   manager.

11       Q.    I am not asking about personal

12   conversations.  We are back to what you just

13   said -- testified about before.  I -- you told me

14   earlier that you listened carefully to Ms.

15   Overton's testimony yesterday, and you just told me

16   that what you do as a store manager is different

17   than what you heard Ms. Overton testify that she

18   does as a store manager.  And what I am asking you

19   is, based on what you heard yesterday, what is it

20   that you believe is different about your

21   responsibility as a store manager than what Ms.

22   Overton testified about?

23            MR. LEVIN:  Object to the form.

24            THE WITNESS:  Honestly, I am not -- I am

25        not sure in the distinction.  I mean I can

36

1    what Ms. Overton testified that she says she does

2    as a store manager?

3           MR. LEVIN:  Object to the form.  Improper

4        predicate.

5           THE WITNESS:  I am going to be 100 percent

6        frank.  I really don't understand the question.

7        I feel, honestly, that I have explained my

8        answer more than enough times in relative terms

9        that anybody in this room can understand it.

10        I -- unless --

11   BY MR. NASH:

12       Q.   So you can't answer the question?

13           MR. LEVIN:  Object to the form.

14           THE WITNESS:  Unless I can speak to

15        counsel, my own counsel, and he can instruct me

16        on the question that is being asked, I don't,

17        sir, honestly understand the question you are

18        asking.

19   BY MR. NASH:

20       Q.   All right.  We will break it down.

21           Well, let me go through a few of the

22   things that you do as a store manager, okay?  See

23   if I can get a sense of it.  You do hire partners

24   for your store as you just testified, correct?

25       A.   Normally, yes.

37

1      Q.    I take it that means you do interview
2  partners?
3      A.    When I have the opportunity to.
4      Q.    And that's something that you do as a
5  store manager?
6          MR. LEVIN:  Object to the form.
7          THE WITNESS:  When I have the opportunity
8      to do it.
9  BY MR. NASH:
10     Q.    Does that mean you have done it?
11     A.    That means I do it when I have the
12  opportunity to do it.
13     Q.    Let me ask you this way.  Isn't it a fact,
14  Mr. Pendlebury, that as a store manager at
15  Starbucks you have interviewed applicants for
16  employment?
17     A.    Yes.
18     Q.    And would you agree that you have done
19  that many times during the period that you have
20  been a store manager at Starbucks?
21          MR. LEVIN:  Object to the form.
22          THE WITNESS:  Yes.
23  BY MR. NASH:
24     Q.    And you have also, during the period you
25  have been a store manager at Starbucks, selected

1    from those applicants who to hire for your store?

2        A.    The majority of the times, yes.

3        Q.    You, as the store manager, have also been

4    responsible, like Ms. Overton, for training the

5    partners who you have hired for your store,

6    correct?

7            MR. LEVIN:  Object to the form.

8            THE WITNESS:  Training as a manager, only

9        as the first impression, which is the first

10       four hours in the certification.  All other

11       things are done by our shift supervisors, which

12       are learning coaches.

13   BY MR. NASH:

14       Q.    When you hire a new partner for your store

15   it is correct that you are responsible for training

16   them?

17           MR. LEVIN:  Object to the form.

18           THE WITNESS:  No.

19   BY MR. NASH:

20       Q.    It's your testimony that as a -- it's your

21   testimony under oath that as the store manager at

22   your store you don't have any responsibility for

23   training the partners you hire?

24           MR. LEVIN:  Object to the form.

25           THE WITNESS:  I have responsibility

39

1          that -- we have a training sheet; that I

2          monitor the training that my shift supervisors

3          do, who are responsible for the training in my

4          store.

5    BY MR. NASH:

6          Q.   So in your store you delegate the training

7    responsibilities to the shift supervisors?

8               MR. LEVIN:   Object to the form.

9               THE WITNESS:   In my store and every other

10         store at Starbucks because that is policy, sir.

11   BY MR. NASH:

12         Q.   I am going to ask you, Mr. Pendlebury, not

13   to argue with me.   I understand your --

14              MR. LEVIN:   He's not arguing with you.

15         He's answering your question.

16              MR. NASH:   I understand.

17   BY MR. NASH:

18         Q.   I said earlier, so I will make it clear

19   again.   I am not asking about other stores right

20   now.   I am going to ask you just about your store

21   and just about your experiences.   Okay?   And let's

22   focus on that.

23              MR. LEVIN:   And I am just going to

24         instruct him that if he can only answer the

25         question a certain way, then you are going to

1          have to live with that answer.  You can

2          certainly question him about his answer, but

3          you are not going to, you know, not allow him

4          to refer to certain things in his answer.

5   BY MR. NASH:

6          Q.   Again, I am going to ask you some

7   questions about what your experiences are as a

8   store manager at Starbucks.  And as I understand

9   what you just testified to, in your -- as a store

10  manager in your store, for the partners who you

11  hire at your store, you delegate the training to

12  your shift supervisors.

13              MR. LEVIN:  Object to the form.

14              THE WITNESS:  In my store, I follow the

15          Starbucks operational manager and training

16          manual, sir, and that is my answer.  And those

17          training manuals state that that duty is

18          delegated out to the shift supervisors who are

19          learning coaches.

20  BY MR. NASH:

21          Q.   Okay.  And as the store manager, you're

22  the person who delegates that responsibility to the

23  shift supervisors, correct?

24              MR. LEVIN:  Object to the form.

25              THE WITNESS:  Yes.  I do decide which

41

1          supervisor will train the partner.

2     BY MR. NASH:

3          Q.    Okay.  Mr. Pendlebury, you're -- as store

4     manager in your store at the Shops of Boca you are

5     also responsible for issuing corrective action to

6     the partners in the store; is that right?

7          A.    To a certain extent, yes.

8          Q.    You have, in fact, issued many written

9     corrective action forms to partners in your store

10    correct?

11              MR. LEVIN:  Object to the form.

12              THE WITNESS:  Yes.

13    BY MR. NASH:

14         Q.    And when I say corrective action, I mean

15    these are disciplinary actions; is that right?

16         A.    Yes.

17         Q.    You are also, as a store manager,

18    responsible for issuing instructions to the

19    partners in the store to make sure that they get

20    the work done that's needed to be done in your

21    store, correct?

22              MR. LEVIN:  Object to the form.

23              THE WITNESS:  I issue instructions only to

24         the extent -- because we have manuals and books

25         to follow.  That -- my instructions are that

```
1        those books need to be followed and that there
2        is procedures to follow.
3   BY MR. NASH:
4        Q.   And isn't it a fact that you make specific
5   instructions, though, for example, if you think
6   something is not being followed?
7             MR. LEVIN:  Object to the form.
8             THE WITNESS:  Yes.  If something is not
9        being followed, yes, I will tell my employees.
10  BY MR. NASH:
11       Q.   In fact you frequently do that in writing;
12  isn't that right?
13            MR. LEVIN:  Object to the form.
14            THE WITNESS:  No.  I am honestly much more
15       of a verbal manager.  I tell my employees.
16  BY MR. NASH:
17       Q.   But you do -- you do issue memos to your
18  employees from time to time when you are either
19  dissatisfied with their performance or when you
20  want to give them instructions about tasks that
21  need to be completed; isn't that right?
22            MR. LEVIN:  Object to the form.
23            THE WITNESS:  Yes.  I have on rare
24       occasion issued those memos, yes.
25  BY MR. NASH:
```

1          THE VIDEOGRAPHER:  The time is 11:28.  We

2     are back on the video record.

3          MR. LEVIN:  I don't know if you need it.

4          MR. NASH:  Yes.  Thank you.

5    BY MR. NASH:

6     Q.   Mr. Pendlebury, let me just -- I want to

7    follow up on something that you were testifying

8    about before when you were describing your -- what

9    you do as a store manager in your store.  And you

10   were making the point that in your -- you believe

11   that what you do is the same as what other store

12   managers do.  And I think you said the reason you

13   believe that is because you do things by the book;

14   is that right?  In other words, by the instructions

15   that you are given from Starbucks?

16          MR. LEVIN:  Object to the form.

17          THE WITNESS:  There are manuals that we

18     use for instruction.  I don't necessarily say

19     that I follow everything by the book.

20   BY MR. NASH:

21     Q.   You -- but when you said before that you

22   believe that what you do in your store is the same

23   as other store managers, I believe that you said

24   the reason you think it's the same is because you

25   do things according to the written instructions

1   that you receive from Starbucks; is that right?

2           MR. LEVIN:  Object to the form.

3           THE WITNESS:  I believe what I said was

4       because I had conversations with other

5       managers.  And through personal conversations

6       and personal interactions with my fellow

7       colleagues and conversations that we have I

8       know that the in fact the duties I do are the

9       same at other stores.

10  BY MR. NASH:

11      Q.   Tell me about those conversations with

12  other managers.  What other managers have you

13  spoken to about the duties that you perform in your

14  store as a store manager?

15      A.   I have talked -- do you want specific

16  names?

17      Q.   Yes, sir.

18      A.   Specific names.  Amy Rose, Vionette.

19      Q.   I am sorry?

20      A.   Her name is Vionette, V-I-O-N-E-T-T-E.  I

21  don't know her store number.  David, from Pompano

22  Plaza.  Jeff, from Holmberg.  Karen, from Federal

23  Highway.  Ernie, from Wellington Green.  Stacey,

24  from Southern and 441.  Darren Jacobs, from

25  Clematis.  Darren, from Turnpike.  Just about every

51

1    manager in South Florida, at some point, when we

2    are at conferences and meetings together.

3         Q.   Can you recall any other specific manager

4    who you have spoken to about your duties as a store

5    manager, other than the individuals that you just

6    named?

7         A.   As manager, Steve O'Flattery.  Sean, from

8    Addison Court.  Laurel Overton.  Other than that, I

9    don't recall anyone else at this time.

10        Q.   And based on those conversations, you

11   believe that the managers who you just mentioned,

12   let's say other than Ms. Overton for the time

13   being, those other managers that you mentioned

14   besides Ms. Overton, you believe they do the

15   same -- that they do the same job as you do as

16   store manager?

17        A.   I know they do the same job as store

18   manager.

19        Q.   And the reason that you know that is based

20   on your conversations with them?

21        A.   Is based -- yes.

22        Q.   Is there anything else that you base your

23   belief on?

24        A.   When a manager calls me and we have a

25   private conversation, is that we don't have time to

52

1    do our normal managerial task because we are on the

2    floor, then I would say that's first-hand knowledge

3    from that manager that I know what they do.

4        Q.    So it's all conversations with these other

5    managers?

6        A.    Yes.

7        Q.    Are all of these other managers that you

8    just mentioned, and who you have talked to about

9    your duties as the store manager, are they all in

10   South Florida?

11       A.    Yes.

12       Q.    Are they all in a particular area of South

13   Florida?

14       A.    Mainly Palm Beach and Broward County.   I

15   know very few managers in Miami-Dade.

16       Q.    Have you spoken to any Starbucks manager

17   about -- Starbucks manager about their job duties,

18   other than someone in Palm Beach or Broward County?

19       A.    Not to my recollection.   ·

20       Q.    So you don't have any personal knowledge

21   of what store managers do, other than the managers

22   in Palm Beach and Broward County; is that right?

23       A.    Any personal knowledge?

24       Q.    Yes.

25       A.    Personal knowledge, no, because I can't

1    speculate on what any -- like I said before, what

2    any other manager would do in any other place

3    so  --

4         Q.    Sir, I don't want you to speculate.

5              And we were just talking a little bit

6    about the written manuals that you have been

7    provided by Starbucks concerning your job.  Are you

8    saying that you don't always follow them?  I didn't

9    quite understand.  You said -- I thought earlier

10   you said you do, but a little while ago I thought

11   you said maybe you don't always.

12             MR. LEVIN:  Object to the form.

13             THE WITNESS:  We have a wide -- we have a

14        wide variety of manuals that we have in our

15        store which are accessible by not only by

16        myself but every shift supervisor and barista.

17        And a lot of times policies that Starbucks

18        has -- dress code is one of them -- aren't

19        specifically written out in certain areas or

20        attendance is not specifically written out and

21        they are left for interpretation.  Normally

22        those things are clarified through our district

23        managers or through conversations we have in

24        our store meetings, and we all come to a

25        consensus on what we are going to do.

1    BY MR. NASH:

2         Q.    Now let me start at the first page.

3    Your -- you tend to write in block letters; is that

4    right?  I have noticed that.

5         A.    Yes.  All upper case, yes.

6         Q.    And just looking at the first page of

7    Exhibit 1 this appears to be a note from you.

8    That's you, Sean, right?

9         A.    Correct.

10        Q.    And it's to Nadine?  Who is Nadine?

11        A.    Nadine is one of my supervisors.

12        Q.    This is a note to Nadine that you wrote;

13   is that right?

14        A.    It's a question, yes.  It's a note of a

15   question.

16        Q.    And I take it you wrote this question

17   because you were concerned that Nadine hadn't done

18   a task that you thought she should have done?

19            MR. LEVIN:  Object to the form.

20            THE WITNESS:  I wrote a note to Nadine

21        because I was curious why she wouldn't have

22        left the tills the way that we typically leave

23        our tills in our store.  We don't typically

24        leave 20s in our tills.

25   BY MR. NASH:

1    Q.    So you wrote this note because you believe

2  that Nadine had not left the tills the way you had

3  expected her to?

4         MR. LEVIN:   Object to the form.

5         THE WITNESS:   I left the note because I

6      wanted Nadine to know that I wanted an answer

7      from her.

8  BY MR. NASH:

9    Q.    On the second page of Exhibit 1 is that --

10  is the notation that begins with "floors were" -- I

11  am sorry -- "sinks and drains were not clean," is

12  that your handwriting?

13    A.    Yes.   That statement is mine.

14    Q.    And Is the next statement that talks about

15  the floors were filthy --

16    A.    Yes.

17    Q.    -- not swept?  Why did you write those

18  statements on the second page of Exhibit 1?

19    A.    I wrote those statements because, as store

20  communications, that was my communication that,

21  since I was the opening supervisor, I wanted to let

22  other partners know what wasn't done.   That

23  actually does appear in other places from other

24  supervisors as well.

25    Q.    So you -- you wrote the two lines that we

1   talked about on page 2 of Exhibit 1 to let your

2   partners know that they hadn't done things that you

3   had expected them to do?

4         MR. LEVIN:  Object to the form.

5         THE WITNESS:  I left those statements on

6      there to let them know that things had not been

7      done as to the way Starbucks closes their

8      stores.

9   BY MR. NASH:

10      Q.   Okay.  Now on the next page, page 3 of

11   Exhibit 1, there appears to be a note to somebody

12   named Christina.  Is that your handwriting?

13      A.   That's correct.

14      Q.   And who is Christina?

15      A.   Christina is a current employee.  She used

16   to be a supervisor.

17      Q.   Okay.  At the time you wrote this note was

18   she a supervisor?

19      A.   Yes.

20      Q.   And it says here -- it appears that you

21   are asking her to spend one hour with Wallace on

22   the bar between 11:00 and 12:00.  Can you explain

23   what that means?

24      A.   Wallace at the time was what we call an

25   RMT.  He was an RMT in my store.  And I wanted him

85

1   to spend time in the bar because he was not

2   understanding the bar.  He was having difficulties

3   on the bar.  And it was most likely my day off,

4   since I don't see my initials or anything anywhere

5   else.  And that was my asking her if she would

6   spend an hour helping him on the bar since she was

7   a learning coach.

8       Q.   I take it, as store manager, when you ask

9   a shift supervisor to do something that you expect

10  them to do it?

11      A.   I would say that's a fair assumption, yes.

12      Q.   And would you say that they understand

13  that if you ask them to do something like this that

14  it's part of their job, they need to do it?

15          MR. LEVIN:  Object to the form.

16          THE WITNESS:  I understand that if I ask

17      some of my shift supervisors or employees to do

18      something that it gets done.  If it doesn't get

19      done, I certainly want to know why.  And I

20      understand that sometimes don't get done.

21  BY MR. NASH:

22      Q.   In this case though you made it clear that

23  this was not an option for Christina; is that

24  right?

25      A.   Correct.

86

1      Q.    Now those are your words, "not an option."

2      A.    Correct.  But since this was six months

3  ago, I can't tell you whether it was or not.  Ms.

4  Wallace is no longer with us as well.

5      Q.    Now there is also a note here -- it's a

6  note to all shifts.

7      A.    Uh-huh.

8      Q.    Is that your handwriting?

9      A.    Yes.

10      Q.    And I assume by all shifts you are talking

11  about all shift supervisors?

12      A.    Correct.

13      Q.    And there is a reference to a short French

14  lady --

15      A.    Yes.  I did not know her name.

16      Q.    -- who is not allowed in our store?

17      A.    Uh-huh.

18      Q.    Could you explain that note for me,

19  please?

20      A.    I had gone to Jeanie.  Jeanie and I had

21  discussed -- because around this time two of the

22  stores in our complex had switched positions.  And

23  she was giving us a hard time.  She would come into

24  the store and start yelling at our customers and

25  just yell at the partners.  She would move the

1    trash can right in front of our store so that it

2    would be a hindrance.  And she was just causing all

3    kinds of problems.

4            And I had gone to Jeanie and discussed

5    things with her.  And Jeanie did not say she could

6    not come in, but as -- it is standard policy if a

7    -- if a customer warrants the fact that they are

8    causing a problem or become a hazard to other

9    customers or the employees we can contact our

10   partner and ask for protection.  And this was one

11   of my decisions where I decided, you know what?  If

12   she continues she's not going to be allowed in our

13   store.

14        Q.    Sure.  The next page of Exhibit 1, is this

15   your handwriting in the store communication to

16   Erin?

17        A.    Yes.

18        Q.    Who is Erin?

19        A.    Erin was a supervisor.

20        Q.    And I take it you're -- this -- you are

21   criticizing Erin because the safe was $10 short; is

22   that right?

23            MR. LEVIN:  Object to the form.

24            THE WITNESS:  I was letting Erin know that

25        standard Starbucks procedure is you don't make


```
 1          change from the safe after you have counted out

 2          of it for the night.  And in going over

 3          everything, being the open supervisor the very

 4          next day, by taking a look at the closing

 5          numbers from the other part of the log that's

 6          not here and what you count into the safe are

 7          different, you can tell that somebody had gone

 8          into the safe afterwards to count out.  And

 9          that's the reason that note is there.  It is

10          not following standard procedure.

11    BY MR. NASH:

12          Q.    And you made it clear in this note that

13    she needed to follow standard procedure?

14                MR. LEVIN:  Object to the form.

15                THE WITNESS:  Yes.

16    BY MR. NASH:

17          Q.    The next page of Exhibit 1 is dated

18    February 17th, 2004.  Is this another note from you

19    to Christina?

20          A.    Yes.

21          Q.    And again, it appears that you are noting

22    to her your disapproval that certain things weren't

23    done on her shift?

24                MR. LEVIN:  Object to the form.

25                THE WITNESS:  I wouldn't necessarily --
```

125

1    manager with Starbucks?

2        A.    I can't recall.

3        Q.    So you may have prepared others than these

4    two pages in Exhibit 2?

5              MR. LEVIN:   Object to the form.

6              THE WITNESS:   Yes.   And I may have done a

7         lot of other things, too.   So I don't

8         understand the reference to that question.

9    BY MR. NASH:

10       Q.    Just trying to find the best of your

11   recollection.

12             You -- as store manager at Starbucks, you

13   are responsible for preparing the performance

14   reviews for all of the partners in your store; is

15   that correct?

16       A.    That's correct.

17       Q.    And that includes the performance reviews

18   for shift supervisors?

19       A.    Correct.

20       Q.    And the performance reviews for baristas?

21       A.    Correct.

22       Q.    And is it correct that as store manager

23   you prepare performance reviews for partners -- is

24   it every six months, based on their anniversary

25   date, or initial employment?

126

1     A.    It's based on six months from their

2  anniversary date or date of promotion, because

3  their anniversary date might be different than, if

4  they were promoted.

5     Q.    And we heard some testimony yesterday

6  about how long it takes to prepare performance

7  reviews and, I believe Ms. Overton said it took her

8  about six hours.  Is that about the same for you?

9     A.    I would say it probably takes about three

10  to four hours total spread out over about four or

11  five weeks to complete one individual review since

12  I have no time actually off my floor to complete my

13  reviews in a timely fashion.

14     Q.    And when do you spend the time to do the

15  performance reviews?

16     A.    Normally I take them home because I have

17  no time to do them in my store.

18     Q.    So you don't do them on your Monday

19  administrative day then, I take it?

20     A.    If I have an extra hour on my Monday time,

21  which I wish I did on most Mondays, I would take

22  the time to do my performance reviews.

23     Q.    But you don't?

24     A.    I can't recall every single Monday.

25     Q.    So the time that it takes you to do these

127

1   performance reviews would be time that is not

2   reflected on your schedule of hours; is that right?

3       A.   No. Because that would affect labor if I

4   scheduled myself --

5       Q.   Right.

6       A.   -- for more than that. And then I would

7   get in trouble for scheduling myself over and going

8   over labor.

9       Q.   Well, your store wouldn't go over labor

10  based on your being scheduled for more hours.

11      A.   If I showed myself on the schedule for

12  more than 40 hours, that would cause ALS to show an

13  overage because that is time scheduled on the

14  schedule. We schedule ourselves for admin time on

15  Mondays, okay, which is noted by a T. And the

16  other 33 hours of the week are scheduled as

17  coverage, which affect labor. We have variants,

18  ideal, which is all labor dealing with the

19  customers; and non coverage, which is time off the

20  floor, which is non coverage. 90 percent of my

21  time is spent as coverage waiting on customers.

22      Q.   The -- and that's -- and you are saying

23  that's reflected on your schedule?

24      A.   I pick up any schedule and take a look for

25  the Ts, yes.

128

1      Q.    Okay.   So it's your testimony that when

2    there is a T, that's -- that's -- you are not on

3    the floor, I take it, for hours where there is a T

4    on the schedule?

5           MR. LEVIN:   Object to the form.

6           THE WITNESS:   When there is a T on the

7       schedule, yes, I could not be on the floor

8       because it could be non coverage.   It could be

9       a meeting, yes.

10   BY MR. NASH:

11     Q.    Right.   The administrative day on Monday,

12   can you tell me the things that you do on that day?

13     A.    Well, going back to Laurel's testimony

14   yesterday would be -- in the time that we have, we

15   would do reviews if we have time.   We would do

16   payroll.   We would do time and attendance.

17     Q.    I am sorry.   I just want to know what you

18   do now so the record is not confused.   Just please

19   tell me what you do.

20     A.    What I do?

21     Q.    Yeah.   Your -- I am asking you now about

22   what you have done as a store manager in your store

23   for Starbucks.   Right now I am asking you about the

24   Monday that you say you do administrative work, and

25   I would like you to explain for me what you do.

129

1      A.    What I do at my store?

2      Q.    Yeah.

3      A.    At my store alone on Mondays, I do

4   scheduling.  I do payroll.  I do time and

5   attendance.  I do reviews if I have time.  I check

6   e-mail, check voice mail.  That typically takes me

7   about eight hours to do.  I go over invoices and

8   reports, because I am not given the time the rest

9   of the week to go over them.  So everything is

10  lumped into one day at my store.

11     Q.    Anything else that you do on that day?

12     A.    It's going to vary.  I can't say for fact

13  that I do something specifically on that -- on any

14  given Monday.  It would vary.  I mean if I have

15  tasks that might need me to be done --

16     Q.    Right.

17     A.    -- I -- I obviously would do those.  If I

18  have a review I need to talk to an employee about,

19  I would do that on a Monday.  A lot of times

20  following up with the managers about how their week

21  went.  A lot of times Jeanie and I might have a

22  conversation.  She might call or I might call her

23  because we are trying to communicate information

24  back and forth.

25          Jeanie is usually pretty good about

130

1   contacting her store managers and getting

2   information to us on Mondays and what she needs

3   from us.  Also, review if there is any new

4   promotions coming in.  You know, I would go over

5   those manuals.  Post new job listings, you know,

6   that were posted.  Pretty much it.  Like I said,

7   there is probably something else that I may be

8   forgetting that occurs on an occasion.

9        Q.   It sounds as if -- is it fair to say that

10  Monday is sort of your planning day for the week?

11            MR. LEVIN:  Object to the form.

12            THE WITNESS:  It's fair to say that, yes,

13       Monday is a planning day because I have to plan

14       my week out very carefully because once again,

15       as I said, I don't have time --

16  BY MR. NASH:

17       Q.   Right.

18       A.   -- to have time during my normal schedule.

19  So if I don't get it done on Monday it's got to

20  wait another week.

21       Q.   So you plan the week for your store on

22  Mondays then.

23            MR. LEVIN:  Object to the form.

24            THE WITNESS:  I plan my schedule out, and

25       the store pretty much runs itself because of

175

1          MR. LEVIN:   Object to the form.

2     BY MR. NASH:

3          Q.    Therefore, the store managers get bonuses?

4          A.    Well, it's a well known fact within

5     Starbucks if you are in an area where the customers

6     just come because it's a huge area, like Miami

7     Beach, where the business is there, people are

8     coming in off the street so the money is just

9     flowing in, it's easier to make your controllable

10    contributions because the money is there.

11          It's a lot harder in my store or in a

12    store like mine where you are only making ten,

13    fifteen -- between ten and 15,000 a week, because

14    it varies at my store.  And you have roughly the

15    same amount of expenses on a month-to-month basis

16    because the supplies you have to order -- you need

17    to run your business.

18          Q.    Let's talk about the supplies.  That's one

19    of the controllables that you -- you have to order

20    in your store certain supplies every month?

21          A.    There are certain supplies that Seattle

22    supplies that I would order, but that can be

23    ordered by a supervisor as well as baristas if that

24    is designated to them.

25          Q.    What kind of supplies are you talking

176

1    about?

2        A.    Soy milk, chai tea, expresso, coffee

3    beans, things that we use in the makings of drinks.

4    Frappuccino mix.  If we have, you know, the need to

5    replace a pitcher, things like that would be

6    ordered from Seattle.  We have to order light bulbs

7    obviously when our light bulbs burn out.  So those

8    are obviously things mandated by me that I have to

9    maintain in my store.  So even though I have to

10   replace the light bulb that is burned out, it's

11   charged as a controllable, because I have to

12   actually pay for it to replace it.  So it's one of

13   those Catch 22 things Starbucks is famous for.

14       Q.    Well, let's talk about things like soy

15   milk.  You have to maintain it in your store.  I

16   take it it's up to you to decide how much soy milk

17   to order based on things like sales and customer

18   volume?

19            MR. LEVIN:  Object to the form.

20            THE WITNESS:  There are par levels that

21       are actually set in a good number of stores.

22       In my stores there are par levels currently

23       that anybody can follow that are on little hang

24       tags that tell whoever is doing the order how

25       much to maintain in the store.

177

1   BY MR. NASH:

2       Q.   But at the store you can make a decision

3   to vary from that?

4            MR. LEVIN:   Object to the form.

5            THE WITNESS:   If I see that the current

6        par was not sufficient and we may have had to

7        go out and -- perfect example, soy -- and

8        actually buy soy or have it transferred from

9        another store, yes, I may make the decision to

10       have that increased or decreased.

11  BY MR. NASH:

12      Q.   And that is true for things like chai?

13      A.   Yes.

14      Q.   Then what about pastries?  You have to

15  decide how much pastries to carry in your store; is

16  that right?

17      A.   In a lot of stores there is a pastry

18  specialist.  In my store I currently do not have

19  one.  But a lot of times those decisions upon

20  running those reports are given to a supervisor or

21  high-performing barista and they would typically

22  look it over.

23           Pastries, most of the times we have to

24  carry the majority of pastries, and those decisions

25  are made for us.  It's only been recently that

178

1    Starbucks has actually given us the opportunity to

2    make adjustments that we don't have to carry

3    certain pastries.  But for the longest time we had

4    to carry everything.

5        Q.   So as a store manager today you can make

6    decisions about which pastries to carry in your

7    store?

8        A.   Within certain guidelines, yes.

9        Q.   And you also can make decisions about how

10   much quantity of particular pastries to order?

11       A.   To a certain extent.  If I order too much,

12   obviously, I am paying for a lot more money and it

13   hits my controllables and I get in trouble for it.

14       Q.   And it also affects your ability to earn a

15   bonus.

16       A.   Yes.

17       Q.   So there is the snapshots.  There is the

18   controllable costs.  And what other factor?  Is it

19   sales and revenue or --

20       A.   Well, everything is basically lumped into

21   what we call controllables.  And sales, you know,

22   store sales would be part of that, as well as other

23   operating expenses.

24       Q.   And so part of your bonuses is dependent

25   upon your ability to drive sales as the store

# Stat**W**orks™
## The Intelligent Labor Scheduler

**SHC PES @ BOCA CE**
Week Ending 12/21/03

Printed 11/07/03  Page 1

DEFENDANT'S EXHIBIT 198-31-04

| EMPLOYEE NAME | MONDAY 12/15/03 | | TUESDAY 12/16/03 | | WEDNESDAY 12/17/03 | | THURSDAY 12/18/03 | | FRIDAY 12/19/03 | | SATURDAY 12/20/03 | | SUNDAY 12/21/03 | | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | |
| Pacelfaniy, Sean Michael | 7:00A-3:30P T | 8.00 | 5:15AM-1:45PM | | 5:15A-1:45P | 8.00 | 5:15A-1:45P | | 5:00A-5:00P | | 3:00P-11:45P | 8.25 | 6:45A-3:15P | 8.00 | 40.00 |
| Deessie, Delmo | 1:30P-9:45P | 7.75 | U | | 1:30P-9:45P | 7.75 | U | | U | | | | 8:30A-1:00P | 4.50 | 28.25 |
| Morales, Cristina | 1:15P-9:45P | 8.00 | | | 1:15P-9:45P | 8.00 | | | 7:30A-4:00P | 8.00 | 3:00P-11:45P | 8.25 | | | 32.00 |
| Quintana, Robert | 5:15A-1:45P | 8.00 | U | | U | | U | | 6:15A-2:30P | 8.25 | 6:15A-3:00P | 8.25 | | | 32.50 |
| Rader, Daniela Alexis | U | | U | | U | | U | | 6:15-11:15P | 8.75 | 8:45P-11:45P | 5.00 | 1:45P-9:15P | 7.00 | 27.50 |
| Rashid, Sardar | U | | U | | U | | U | | U | | U | | | | |
| Runhaar, Erin | 5:15P-9:45P | 4.50 | 1:30P-9:45P | 7.75 | 5:30P-9:45P | 4.25 | | | 2:45P-11:15P | 8.75 | U | | 2:00P-9:15P | 8.75 | 28.25 |
| Badran, Nadine | U | | 8:30A-4:00P | 7.00 | U | | U | | 7:00A-2:00P | 8.25 | U | | | | 13.25 |
| Edwin, Russ | 6:15A-4:00P | 7.25 | 8:45P-9:45P | 4.00 | 6:15A-1:30P | 8.00 | 1:15P-9:45P | 8.00 | U | | 6:15A-2:45P | 8.00 | 6:45A-2:00P | 8.75 | 34.00 |
| Hurtado, Johanna | 5:15A-1:45P | 8.00 | 7:00A-1:00P | 8.00 | 5:15A-1:30P | 7.75 | 5:15A-12:00P | 8.25 | | | 8:00A-1:00P | 4.00 | | | 32.00 |
| Perez, Jerry | 7:00A-1:00P | 6.00 | U | | 7:00A-12:00P | 6.00 | 7:00A-1:00P | 6.00 | 7:00A-1:00P | 6.00 | U | | U | | 22.00 |
| Simikh, Thomas | | | U | | 7:00A-4:00P | 7.00 | 8:30A-4:00P | 7.00 | 2:00P-11:15P | 8.75 | 8:30A-3:30P | 6.50 | | | 19.25 |
| Vasco, Katherine | | | | | 8:30A-4:00P | 7.00 | 8:45 5:45 | | | | 8:30A-3:30P | | | | 14.00 |
| Zreily, Stephen | | | | | U | | | | | | 3:15P-11:45P | 8.00 | 6:15P-9:15P | 4.00 | 20.00 |
| | | | | | | | | | | | | | | | |
| **MANAGER'S FORECAST** | | | | | | | | | | | | | | | |
| SPH | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 56.50 | WK TOTAL 56.50 | DAILY 47.50 | WK TOTAL 104.00 | DAILY 47.75 | WK TOTAL 151.76 | DAILY 47.25 | WK TOTAL 199.00 | DAILY 69.00 | WK TOTAL 268.00 | DAILY 48.00 | WK TOTAL 306.00 | DAILY 37.00 | WK TOTAL 343.00 | 343.00 |
| SHIFT COVERAGE | | | | | | | | | | | | | | | |

# StaffWorks™
The Intelligent Labor Scheduler

**St..PPES @ BOCA CE**
Week Ending 04/04/04

| EMPLOYEE NAME | MONDAY 03/29/04 SHIFT | HRS | TUESDAY 03/30/04 SHIFT | HRS | WEDNESDAY 03/31/04 SHIFT | HRS | THURSDAY 04/01/04 SHIFT | HRS | FRIDAY 04/02/04 SHIFT | HRS | SATURDAY 04/03/04 SHIFT | HRS | SUNDAY 04/04/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendabury, Sean Michael | • 6:00A-12:00PT | 5.50 | 5:15A-1:45P | 8.00 | 5:15A-1:45P | 8.00 | 1:15P-9:45P | 8.00 | • 7:00A-3:30P | 8.00 | U | | • 3:00P-9:15P | 5.75 | 45.75 |
| | • 12:00P-2:30P | 2.50 | | | | | | | | | | | | | |
| Deasin, Delmo | • 1:30P-9:45P | 7.75 | • 4:00P-9:45P | 5.75 | • 2:00P-9:45P | 7.25 | U | | U | | U | | • 8:30A-12:30P | 4.00 | 33.00 |
| Hurtado, Johanna | • 5:15A-1:45P | 8.00 | 5:15A-12:30P | 6.75 | | | 5:15A-1:45P | 8.00 | • 5:15A-1:45P | 8.00 | • 3:00P-11:45P | 8.00 | • 12:45P-9:15P | 8.00 | 38.75 |
| Morales, Cristina | • 3:00P-9:45P | 6.25 | U | | U | | U | | • 3:00P-11:15P | 7.75 | • 8:00A-4:30P | 8.00 | • 6:45A-3:15P | 8.00 | 30.00 |
| Flatter, Daniele Alexis | • 5:15A-11:30A | 5.75 | U | | • 5:15A-11:45A | 6.00 | 5:15A-11:00A | 5.75 | U | | • 6:15A-1:00P | 6.25 | U | | 23.75 |
| Rashid, Sardar | • 7:30A-4:00P | 8.00 | • 7:00A-3:30P | 8.00 | U | | U | | U | | 3:45-11:15⊘ | 7.50 | U | | 16.00 |
| Punhasar, Erin | | | • 2:00P-9:45P | 7.25 | • 1:15P-9:45P | 8.00 | • 3:00P-9:45P | 4.75 | • 2:45P-11:15P | 8.00 | • 6:15A-3:15P | 8.50 | • 6:45A-1:00P | 5.75 | 35.50 |
| Badran, Nadine | | | • 1:15P-9:45P | 8.00 | | | • 7:15A-3:45P | 8.00 | • 5:15A-12:45P | 7.00 | • 6:15A-3:15P | 8.50 | U | | 37.25 |
| | U | | U | | U | | U | | U | | U | | U | | |
| Perez, Jerry | • 7:00A-12:00P | 5.00 | U | | • 7:00A-12:00P | 5.00 | U | | U | | U ⊘ | | U | | 10.00 |
| Simkin, Thomas | • 5:15P-9:45P | 4.50 | U | | • 4:30P-9:45P | 5.25 | | 25 | • 5:00P-11:15P | 5.75 | 4:45P-11:45P | 6.50 | U | | 29.25 |
| Visco, Katherine | U | | • 9:30A-1:15P | 4.75 | • 8:15A-3:30P | 6.75 | 8:15A-1:30P | 6.25 | • 8:15A-3:00P | 6.25 | U | | U | | 23.00 |
| *WALLACE* | *6:23 pm* | | *5:15 - 1:45* | | | | *1:15 - 9:45* | | *7 - 3:30* | | | | *12:45 -9:45* | | |

Handwritten across the bottom of the sheet:

*CHANGED... SCHEDULE MAY HAVE CHANGED... PLEASE REVIEW CAREFULLY... YOU ARE RESPONSIBLE*

| MANAGER'S FORECAST | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5PH | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 53.25 | | DAILY 48.50 | | DAILY 48.25 | | DAILY 47.00 | | DAILY 50.75 | | DAILY 45.00 | | DAILY 31.50 | | 322.25 |
| | | | WK TOTAL 101.75 | | WK TOTAL 148.00 | | WK TOTAL 195.00 | | WK TOTAL 245.75 | | WK TOTAL 290.75 | | WK TOTAL 322.25 | | |
| SHIFT COVERAGE | | | | | | | | | | | | | | |

*Printed 01/21/04  5:44 PM*

# Stat Works™
## The Intelligent Labor Scheduler

SHO. PES @ BOCA CE

Week Ending 04/18/04

Page 1  Printed 04/07/04  2:54PM

| EMPLOYEE NAME | MONDAY 04/12/04 SHIFT | HRS | TUESDAY 04/13/04 SHIFT | HRS | WEDNESDAY 04/14/04 SHIFT | HRS | THURSDAY 04/15/04 SHIFT | HRS | FRIDAY 04/16/04 SHIFT | HRS | SATURDAY 04/17/04 SHIFT | HRS | SUNDAY 04/18/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | • 5:15A- 8:30A<br>• 8:00P-1:45P T | 3.25<br>4.75 | • 5:15A-1:45P | 8.00 | • 9:00A-5:30P T<br>PTO | 8.00 | • 7:15A-3:45P | 8.00 | 10:00A-2:30P T | 8.00 | • 8:30A-1:00P | 4.50 | • 8:00A-12:00P T | 4.00 | 54.25 |
| Deastis, Daimo | • 1:30P-9:45P | 7.75 | U | | • 1:30P-9:45P | 7.75 | U | | • 7:00P-11:15P | 4.25 | • 3:15P-11:45P | 8.00 | • 3:00P-9:15P<br>• 8:45A-2:00P | 5.75<br>6.75 | 34.50 |
| Hurtado, Johanna | 7:15A-3:30P | 7.75 | • 5:15A-1:30P | 7.75 | | | • 1:15P-9:45P | 8.00 | • 6:15A-2:30P | 8.75 | • 6:15A-3:15P | 8.50 | | | 40.75 |
| Rafer, Danielle Alexis | U | | U | | • 5:15A-11:30A | 5.75 | • 5:15A-11:00A | 5.75 | U | | • 6:15A-3:30P | 8.75 | U | | 20.25 |
| Rashid, Sardar | | | • 2:00P-9:45P | 7.25 | U | | U | | U | | | | • 5:00P-9:15P | 4.25 | 11.50 |
| Rumhaar, Erin | | | • 1:15P-9:45P | 8.00 | • 1:30P-9:45P | 7.75 | • 2:45P-9:45P | 6.50 | • 2:30P-11:15P | 8.25 | • 3:15P-11:45P | 8.00 | U | | 38.50 |
| Badran, Nadine | • 5:15A-1:45P | 8.00 | 7-12 | | • 5:15A-1:45P | 6.00 | 5:15A-1:30P | 7.75 | • 5:15A-1:45P | 8.00 | U | | • 8:45A-3:15P | 8.00 | 39.75 |
| Male, Victor | U | | U | | U | | U | | U | | U | | U | | |
| | | | U | | U | | U | | U | | U | | U | | |
| Morales, Cristina | | | U | | U | | U | | U | | U | | U | | |
| Perez, Jerry | | | | | • 7:00A-12:00P | 5.00 | U | | • 7:00A-12:30P | 5.50 | U | | U | | 10.50 |
| Simkin, Thomas | • 5:15P-9:45P | 4.50 | • 5:15P-9:45P | 4.50 | U | | U | | • 2:45P-11:15P | 8.00<br>2:30 p.m. | • 6:00P-11:45P | 5.75 | 1:00P-9:15P | 7.75 | 30.50 |
| Visco, Katharine | • 8:30A-2:00P | 5.50 | • 8:15A-3:30P | 6.75 | • 8:30A-3:00P | 6.00 | 8:30A-2:30P | 6.00 | • 8:15A-3:30P | 8.25 | U | | U | | 30.50 |
| Kozi, Z-PHANT | • 2:00P-9:45P | 7.25 | U | | • 5:30P-9:45P | 4.25 | 5:30P-9:45P | 4.25 | U | | U | | U | | 11.50 |

MANAGER'S FORECAST

SPH

| TOTAL SCHEDULED HOURS | DAILY 46.75 | DAILY | DAILY 19.75 | DAILY | DAILY | DAILY 127.50 | DAILY | |
| SHIFT COVERAGE | 4 | 6 | | | | | | |

222.80

# Stat Works™
## The Intelligent Labor Scheduler

**SHO..PES @ BOCA CE**
Week Ending 06/20/04

Printed 06/07/04 1:49PM
Page 1

| EMPLOYEE NAME | MONDAY 06/14/04 SHIFT | HRS | TUESDAY 06/15/04 SHIFT | HRS | WEDNESDAY 06/16/04 SHIFT | HRS | THURSDAY 06/17/04 SHIFT | HRS | FRIDAY 06/18/04 SHIFT | HRS | SATURDAY 06/19/04 SHIFT | HRS | SUNDAY 06/20/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | U | | U | | 9:30A-4:30P T *(LMS)* | 6.50 | 7:30A-5:30P T | 9.50 | 5:15A-10:30A | 5.25 | 7:00P-11:15P | 4.25 | 12:45P-9:15P | 8.00 | 38.00 |
| Badran, Nadine | U | | U | | | | | | 10:30P-3:30P T | 4.50 | | | | | 37.00 |
| Deassa, Dalmo | | 7.00 | 2:45P-9:45P | 7.00 | | | *class* 1:00P-5:00P T | 4.00 | 7:15A-3:45P | 8.50 | 6:15A-3:15P | 9.00 | 12:45P-9:15P | 8.50 | 37.00 |
| Hurtado, Johanne | 1:30P-9:45P | 7.75 | U | | 5:45P-9:45P T | 7.75 | | | U | | 3:00P-11:15P | 7.75 | 8:15A-12:45P | 4.00 | 27.25 |
| Opitzzi, Maria | 5:15A-1:45P | 8.00 | 5:15A-1:30P | 7.75 | 5:15A-1:45P | 8.00 | 5:45P-9:45P | 4.00 | 6:45P-11:15P | 4.50 | | | 6:45A-1:00P | 5.75 | 30.00 |
| Rafer, Danielle Alexis | U | | | 8.00 | 1:30-9:15 | 4.25 | 1:15P-9:45P | 8.00 | 3:45P-11:15P | 7.00 | 6:15A-3:15P | 8.50 | U | | 35.25 |
| Calvert, Jaclyn | 1:15P-9:45P | 8.00 | 7:15A-2:00P | 6.25 | U | | 5:15A-1:30P | 7.75 | U | | 3:00P-11:15P | 7.75 | U | | 16.25 |
| Cunningham, Kathryn | | | 5:30P-9:45P | 4.25 | 2-9:45 | | 2:00P-9:45P | 7.25 | 7:30A-4:30P | 8.00 | | | 10:45-1pm | | 27.75 |
| Ferrante, Rosolino | 5:15P-9:45P | 4.50 | 1:15-9:50 | 8.50 | 5:30-9:45 | 7.25 | 8:00A-3:00P | 6.50 | 3:00P-11:15P | 7.75 | U | | U | | 23.75 |
| Harris, Diane | | | U | | U 5:30-9:45 | | U 1:15pm | | U 4-8pm | | U | | U | | 32.50 |
| Levine, Randie | 5:15A-1:00P | 7.25 | 5:15A-11:00A | 5.75 | 5:15A-10:30A | 5.25 | 5:15A-10:30A | 5.25 | 5:15A-1:45P | 8.00 | 8:15A-2:00P | 5.75 | U | | 16.25 |
| Maia, Victor | U | | U | | 6:00A-3:00P | 6.50 | U | | U | | U | | U | | 21.00 |
| Morales, Cristina | 7:00A-12:30P | 5.50 | U | | 7:00A-1:00P | 6.00 | 7:15A-12:00P | 4.75 | U | | U | | U | | 6.50 |
| Perez, Jerry | U | | U | | U | | U | | U | | U | | 5-9:5A U | | 16.25 |
| Simkin, Thomas | 10:00A-3:00P | 5.00 | U | | U | | U | | U | | U | | U | | 5.00 |
| Visco, Katharine | | | | | | | | | | | | | | | |

| MANAGER'S FORECAST | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPH | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 46.00 / WK TOTAL 46.00 | | DAILY 45.50 / WK TOTAL 91.50 | | DAILY 51.50 / WK TOTAL 143.00 | | DAILY 57.00 / WK TOTAL 200.00 | | DAILY 53.50 / WK TOTAL 253.50 | | DAILY 43.00 / WK TOTAL 296.50 | | DAILY 36.25 / WK TOTAL 332.75 | | WK TOTAL 332.75 |
| SHIFT COVERAGE | Morning 3 / Afternoon 4 / Evening 3 | | Morning 4 / Afternoon 3 / Evening 3 | | Morning 4 / Afternoon 5 / Evening 3 | | Morning 5 / Afternoon 5 / Evening 3 | | Morning 4 / Afternoon 4 / Evening 3 | | Morning 3 / Afternoon 4 / Evening 3 | | Morning 3 / Afternoon 2 / Evening 3 | | |

*Handwritten notes:* "Pharow", "7-7:30", "7-12:30", "10-2", "8:8 Kaufsser 8-12-5", "ADD CC 501-703 8755"

# Stat Works™
### The Intelligent Labor Scheduler

## SHC PES @ BOCA CE
### Week Ending 05/23/04

Page 1    Printed 05/17/04

| EMPLOYEE NAME | MONDAY 05/17/04 SHIFT | HRS | TUESDAY 05/18/04 SHIFT | HRS | WEDNESDAY 05/19/04 SHIFT | HRS | THURSDAY 05/20/04 SHIFT | HRS | FRIDAY 05/21/04 SHIFT | HRS | SATURDAY 05/22/04 SHIFT | HRS | SUNDAY 05/23/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | 8:00A-2:30P T | 8.00 | 5:15A-1:45P | 8.00 | 1:15P-9:45P | 8.00 | 8:00A-4:30P T | 8.00 | 5:15A-1:45P | 8.00 | U | | 1:15-9:15 | | 40.00 |
| Badran, Nadine | | | 1:30P-9:45P | 7.75 | 2:00P-9:45P | 7.25 | 7:00A-3:30P | 8.00 | | | 6:15A-3:15P | 8.50 | | | 24.25 |
| Deaste, Dalmo | 1:30P-9:45P | 7.75 | U | | 2:00P-9:45P | 7.25 | | | U | | 3:15P-11:45P | 8.00 | 8:15A-1:30P | 4.75 | 27.75 |
| Hurtado, Johanna | 2:00P-9:45P | 7.25 | 7:30A-3:30P | 7.50 | 5:15A-1:30P | 7.75 | 1:45P-9:45P | 7.50 | U | | U | | U | | 38.00 |
| Morales, Cristina | 8:00A-4:30P | 8.00 | U | | 8:00A-3:45P | 7.25 | U | | U | | U | | U | | 15.25 |
| R  Opptzd, Maria | U | | U | | U | | U | | U | | 2:45P-11:45P | 8.50 | 12:45P-9:15P | 8.00 | 24.50 |
| Rafer, Daniela Alexis | 5:15A-1:45P | 8.00 | U | | U | | 5:15A-1:45P | 8.00 | U | | U | | 6:45A-1:30P | 6.25 | 22.25 |
| Calvot, Jaclyn | U | | U | | U | | U | | U | | U | | U | | |
| Cunnigham, Kathryn | 8:45A-2:30P | 5.75 | 2:00P-9:45P | 7.25 | | | 1:15P-9:45P | 8.00 | 8:00A-4:30P | 8.00 | 9:00A-3:00P | 6.00 | U | | 35.00 |
| Ferrante, Rosalino | U | | U | | U | | U | | U | | U | | U | | |
| Levine, Randle | 5:15A-12:00P | 6.25 | | | | | 7:30A-12:15P | 4.75 | | | 8:00A-12:45P | 4.75 | 6:45A-12:45P | 6.00 | 21.75 |
| Mala, Victor | | | 5:15A-12:00P | 6.25 | 5:15A-1:45P | 8.00 | 5:15A-1:30P | 7.75 | | | 6:15A-1:15P | 6.50 | U | | 28.50 |
| R  Perez, Jerry | U | | U | | 7:00A-12:00P | 5.00 | U | | 7:00A-1:00P | 6.00 | U | | U | | 11.00 |
| Strelde, Thomas | 5:15P-9:45P | 4.50 | 5:15P-9:45P | 4.50 | 5:15P-9:45P | 4.50 | U | | 2:45P-11:15P | 8.00 | U | | 1:15P-9:15P | 7.50 | 29.00 |
| Vlisco, Katharine | U | | 8:15A-1:00P | 4.75 | | | U | | U | | U | | | | 4.75 |
| MANAGER'S FORECAST | | | | | | | | | | | | | | | |
| SPH | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 55.50 / WK TOTAL 55.50 | | DAILY 46.00 / WK TOTAL 101.50 | | DAILY 47.75 / WK TOTAL 149.25 | | DAILY 52.00 / WK TOTAL 201.25 | | DAILY 46.00 / WK TOTAL 247.25 | | DAILY 42.25 / WK TOTAL 289.50 | | DAILY 32.50 / WK TOTAL 322.00 | | 322.00 |
| SHIFT COVERAGE | 6  6  3 | | 4  4  3 | | 4  4  3 | | 5  5  2 | | 4  3  2 | | 4  2  2 | | 3  2  2 | | |

# StairWorks™
The Intelligent Labor Scheduler

SHOPPES @ BOCA CE
Week Ending 04/11/04

Page 1   Printed 04/01/04   1:05 PM

| EMPLOYEE NAME | MONDAY 04/05/04 SHIFT | HRS | TUESDAY 04/06/04 SHIFT | HRS | WEDNESDAY 04/07/04 SHIFT | HRS | THURSDAY 04/08/04 SHIFT | HRS | FRIDAY 04/09/04 SHIFT | HRS | SATURDAY 04/10/04 SHIFT | HRS | SUNDAY 04/11/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | • 5:15A-7:30A | 2.25 | • 5:15A-8:30A | 3.25 | • 5:15A-1P | 7.25 | • 1:15P-9:45P | 8.00 | U | | | | • 6:45A-1:00P | 5.75 | 42.25 |
| x | • 7:30A-1:45P T | 5.75 | • 8:30A-6:00P T | 9.00 | • 2:00P T | 1.00 | | | | | | | | | |
| x Deassis, Dalmo | • 1:30P-9:45P | 7.75 | • 3:00P-9:45P | 6.25 | • 1:30P-9:45P | 7.75 | U | | U | | • 3:00P-11:45P | 3.75 | U | | 33.75 |
| x Hurtado, Johanna | | | • 8:00A-2:30P | 6.00 | • 5:15A-1:45P | 8.00 | | 7.75 | • 5:15A-2:15P | 8.50 | • 6:15A-3:15P | 8.50 | U | | 38.75 |
| Morales, Cristina | • 3:00P-9:45P | 6.25 | U | | U | | U | | U | | U | | U | | 6.25 |
| x Rafer, Daniele Alexis | U | | U | | U | | • 5:15A-11:30A | 5.75 | U | | • 6:15A-1:30P | 6.75 | • 4:15P-9:15P | 5.00 | 17.50 |
| Rashid, Serdar | • 7:30A-4:00P | 8.00 | • 7:00A-3:30P | 8.00 | U | | U | | U | | U | | U | | 16.00 |
| x Runhaar, Erin | | | • 1:30P-9:45P | 7.75 | • 2:00P-9:45P | 7.25 | U | | • 2:45P-11:15P | 8.00 | • 4:00P-11:45P | 7.25 | • 12:45P-9:15P | 8.00 | 38.25 |
| x Badran, Nadine | • 5:15A-1:45P | 8.00 | • 5:15A-1:15P | 7.50 | 7-12 | | • 2:30P-9:45P | 6.75 | • 5:15A-1:45P | 8.00 | U | | • 5:00P-9:15P | 4.25 | 34.50 |
| ~~Chiquillos~~ | U | | U | | U | | U | | U | | U | | U | | |
| Perez, Jerry | | | | | • 7:00A-12:00P | 5.00 | | | • 7:00A-1:00P | 6.00 | U | | U | | 11.00 |
| x Simkin, Thomas | • 5:30P-9:45P | 4.25 | • 5:30P-9:45P | 4.25 | • 5:30P-9:45P | 4.25 | U | | • 2:00P-11:15P | 8.75 | • 7:00P-11:45P | 4.75 | U | | 26.25 |
| x Visco, Katherine | U | | U | | • 10:00A-3:15P | 5.25 | • 8:15A-3:30 | 6.15 | • 8:15A-3:30P | 6.75 | U | | U | | 18.75 |
| | 7-1 SEAN | | 11-2 JUSTIN | | MSR | | ORDERS! SHIFTS ? ~~Schedule~~ ~~Employee~~ | | 7:30-3:30 | | 8-4:30 ANDREW | | 8-4:30 BARBARA 6:45-12 ANDREW 6:45-3:15 | | |
| WALLACE | 7-3:30 | | 8:30-4:30 | | | | 1:15-9:45 | | | | | | | | |
| MANAGER'S FORECAST | | | | | | | | | | | | | | | |
| SPH | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 48.25 | WK TOTAL 48.25 | DAILY 52.00 | WK TOTAL 100.25 | DAILY 45.75 | WK TOTAL 146.00 | DAILY 35.00 | WK TOTAL 181.00 | DAILY 49.75 | WK TOTAL 230.75 | DAILY 43.50 | WK TOTAL 274.25 | DAILY 36.25 | WK TOTAL 310.50 | 310.50 |
| SHIFT COVERAGE | Morning Afternoon Evening 4 4 3 | | Morning Afternoon Evening 4 4 3 | | Morning Afternoon Evening 3 5 3 | | Morning Afternoon Evening 3 2 2 | | Morning Afternoon Evening 4 4 3 | | Morning Afternoon Evening 3 2 3 | | Morning Afternoon Evening 3 2 3 | | |

# Star*Works™
The Intelligent Labor Scheduler

## SHOPPES @ BOCA CE
### Week Ending 02/22/04

Page 1        Printed 02/15/04  1:59PM

| EMPLOYEE NAME | MONDAY 02/16/04 SHIFT | HRS | TUESDAY 02/17/04 SHIFT | HRS | WEDNESDAY 02/18/04 SHIFT | HRS | THURSDAY 02/19/04 SHIFT | HRS | FRIDAY 02/20/04 SHIFT | HRS | SATURDAY 02/21/04 SHIFT | HRS | SUNDAY 02/22/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | 7:00A-3:30P T | 8.00 | 5:15A-8:30A / 9:00P-7:45P T | 3.25 / 4.75 | | | 5:15A-1:30P / 6:00P-9:00P T | 7.75 / 4.00 | 10:00A-6:30P T | 8.00 | | | 8:30A-12:00P / 1:00P-5:00P T | 3.50 / 4.50 | 43.75 |
| R  Deasis, Dalmo | U | | U | | U | | U | | U | | U | | U | | |
| Hurtado, Johanna | 8:30A-4:00P | 7.00 | 7:45A-3:45P | 7.50 | 5:15A-1:30P | 7.75 | 5:15A-1:30P | 7.75 | U CLASS | | 6:15A-3:15P | 8.50 | | | 41.50 |
| Morales, Cristine | 3:00P-9:45P | 6.25 | U | | U | | U | | U | | 7:30-11:15P | 5.00 | 6:45A-2:30P | 7.25 | 26.75 |
| Rafer, Daniele Alexis | U | | U | | 5:15A-12:00P | 6.25 | U | | 2:30P-11:15P | 8.25 | 6:15A-3:15P | 8.50 | | | 19.75 |
| Rashid, Sardar | 5:15A-1:30P | 7.75 | 7:15A-2:15P | 6.50 | 5:15A-12:00P | 6.25 | 1:15P-9:45P | 8.00 | 5:15A-2:30P | 8.75 | 3:00P-11:45P | 8.25 | 2:15P-8:15P | 6.50 | 39.25 |
| Runhaar, Erin | | | 2:45P-9:45P | 6.50 | 1:15P-9:45P | 8.00 | U | | 6:45P-11:15P | 4.50 | U | | 2:15P-8:15P | 4.25 | 25.50 |
| Badran, Nadine | 5:15A-1:45P | 8.00 | 5:15A-12:00P | 6.25 | 1:30P-9:45P | 7.75 | U | | 5:15A-12:15P | 6.50 | U | | 5:00P-9:15P | 4.25 | 32.75 |
| Eckert, Rosa | U | | U | | U | | U | | 2:15P-11:15P | 8.50 | U | | 1:00P-9:15P | 7.75 | 16.25 |
| Perez, Jerry | 7:00A-1:00P | 6.00 | U | | 7:00A-1:00P | 6.00 | 7:00A-12:00P | 5.00 | 7:00A-1:00P | 6.00 | U | | U | | 23.00 |
| Simkin, Thomas | 5:15P-9:45P | 4.50 | 5:30P-9:45P | 4.25 | 5:30P-9:45P | 4.25 | 5:30P-9:45P | 4.25 | | | 3:15P-11:45P | 8.00 | | | 25.25 |
| Visco, Katherine | U | | 8:30A-1:30P | 5.00 | 8:30A-4:00P | 7.00 | 8:30A-4:30P | 7.50 | 8:30A-4:00P | 7.00 | 8:30-7:30 / 3:45P-11:45P | 4.75 | U | | 26.50 |
| Znety, Stephan | 1:15P-9:45P | 8.00 | 1:45P-9:45P | 7.50 | | | 1:30P-9:45P | 7.75 | 8:30A-4:00P | 7.00 | 6:45A-3:15P | 4.75 | 6:45A-3:15P | 8.00 | 36.00 |
| | | | | | | | | | | | | | | | |
| **MANAGER'S FORECAST** | | | | | | | | | | | | | | | |
| **SPH** | | | | | | | | | | | | | | | |
| **TOTAL SCHEDULED HOURS** | DAILY 55.50 | WK TOTAL 55.50 | DAILY 51.50 | WK TOTAL 107.00 | DAILY 47.00 | WK TOTAL 154.00 | DAILY 55.00 | WK TOTAL 209.00 | DAILY 57.50 | WK TOTAL 266.50 | DAILY 43.00 | WK TOTAL 309.50 | DAILY 46.75 | WK TOTAL 356.25 | 356.25 |
| **SHIFT COVERAGE** | Morning 5 Afternoon 4 Evening 3 | | 6 4 3 | | 4 3 3 | | 4 5 5 | | 4 4 3 | | 4 2 3 | | 3 6 3 | | |

# Staff Works™
The Intelligent Labor Scheduler

## SHO..ES @ BOCA CE
### Week Ending 02/01/04

Page 1   Printed 01/12/04   11:51AM

| EMPLOYEE NAME | MONDAY 01/26/04 SHIFT | HRS | TUESDAY 01/27/04 SHIFT | HRS | WEDNESDAY 01/28/04 SHIFT | HRS | THURSDAY 01/29/04 SHIFT | HRS | FRIDAY 01/30/04 SHIFT | HRS | SATURDAY 01/31/04 SHIFT | HRS | SUNDAY 02/01/04 SHIFT | HRS | WEEK TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | 7:00A-3:30P T | 8.00 | 5:15A-1:45P | 8.00 | 8:00A-4:30P msd | 8.00 | | | | | 8:00A-4:30P T meeting | 8.00 | 12:45P-5:00P T count 5:00P-9:15P | 4.25 3.75 | 40.00 |
| Deasis, Dalmo | 1:30P-9:45P | 7.75 | U | | 1:30P-9:45P | 7.75 | U | | U | | 3:00P-11:45P | 8.25 | 8:30A-2:00P | 5.50 | 29.25 |
| Morales, Cristina | | | U | | 10:00A-2:00P | 4.00 | U | | 2:15P-11:15P | 8.50 | | | 6:45A-2:00P | 6.75 | 19.25 |
| Quintana, Robert | U | | U | | U | | U | | U | | U | | U | | |
| Rater, Daniele Alexis | 5:15A-11:30A | 5.75 | U | | 5:15A-10:00A | 4.75 | 5:15A-1:30P | 7.75 | U | | | | U | | 33.50 |
| Rashid, Sardar | 7:45A-4:00P | 7.75 | 5:15A-1:15P | 7.50 | 5:15A-1:45P | 6.00 | 1:15P-9:45P | 8.00 | 5:15A-2:15P | 8.50 | 6:15A-3:00P | 8.25 | 1:45P-9:15P | 7.00 | 39.75 |
| Ranhasar, Erin | 5:45P-9:45P | 4.00 | 1:15P-9:45P | 8.00 | U | | U | | U | | | | | | 12.00 |
| Badran, Nadine | 1:15P-9:45P | 8.00 | 2:00P-9:45P | 7.25 | 5:15P-9:45P | 4.50 | 2:00P-9:45P | 7.25 | | | | | 6:45A-12:45P | 6.00 | 33.00 |
| Eckart, Russ | U | | U | | U | | U | | U | | | | | | 16.50 |
| Hurtado, Johanna | 5:15A-1:45P | 8.00 | 7:45A-4:00P | 7.75 | | | 5:15A-12:00P | 6.25 | 5:15A-1:45P | 8.00 | 6:15A-2:45P | 8.00 | | | 38.00 |
| Perez, Jerry | 7:00A-1:00P | 6.00 | | | | | U | | 7:00A-12:30P | 5.50 | | | | | 17.50 |
| Simkin, Thomas | | | 5:45P-9:45P | 4.00 | 7:00A-1:00P | 6.00 | 5:45P-9:45P | 4.00 | 8:00P-11:15P | 5.25 | 7:00P-11:45P | 4.75 | | | 18.00 |
| Visco, Katherine | U | | U | | 8:30A-3:45P | 6.75 | 8:30A-4:15P | 7.25 | 8:30A-4:00P | 7.00 | U | | U | | 21.00 |
| Znely, Stephen | | | 7:15A-12:30P | 5.25 | 2:00P-9:45P | 7.25 | 7:00A-12:30P | 5.50 | | | 8:30A-3:30P | 6.50 | 2:00P-9:15P | 6.75 | 31.25 |
| | | | | | | | | | | | | | | | |
| MANAGER'S FORECAST | | | | | | | | | | | | | | | |
| SPH | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 55.25 WK TOTAL 55.25 | | DAILY 47.75 WK TOTAL 103.00 | | DAILY 57.00 WK TOTAL 160.00 | | DAILY 46.00 WK TOTAL 206.00 | | DAILY 51.00 WK TOTAL 257.00 | | DAILY 52.00 WK TOTAL 309.00 | | DAILY 40.00 WK TOTAL 349.00 | | WK TOTAL 349.00 |
| SHIFT COVERAGE: | Morning Afternoon Evening 5  5  3 | | Morning Afternoon Evening 4  4  3 | | Morning Afternoon Evening 5  6  3 | | Morning Afternoon Evening 4  3  3 | | Morning Afternoon Evening 4  4  3 | | Morning Afternoon Evening 4  4  3 | | Morning Afternoon Evening 3  5  3 | | |

# StaffWorks™
The Intelligent Labor Scheduler

## St...PPES @ BOCA CE
### Week Ending 01/11/04

Page 1     Printed 12/28/03   1:24PM

| EMPLOYEE NAME | MONDAY 01/05/04 SHIFT | HRS | TUESDAY 01/06/04 SHIFT | HRS | WEDNESDAY 01/07/04 SHIFT | HRS | THURSDAY 01/08/04 SHIFT | HRS | FRIDAY 01/09/04 SHIFT | HRS | SATURDAY 01/10/04 SHIFT | HRS | SUNDAY 01/11/04 SHIFT | HRS | WEEK TOTALS HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | 7:00A-3:30P | 8.00 | 5:15A-8:30A | 3.25 | | | 10:00A-6:30P | 8.00 | 5:15A-2:00P | 8.25 | 6:15A-2:45P | 8.00 | 6:15A-2:45P | 8.00 | 48.25 |
| | | | 8:30P-1:45P T | 4.75 | | | meeting | | | | | | | | |
| Deasis, Delmo | 1:30P-9:45P | 7.75 | U | | 1:30P-9:45P | 7.75 | U | | U | | 3:15P-11:45P | 8.00 | 7:45A-2:00P | 5.75 | 29.25 |
| Morales, Cristina | 5:15A-1:45P | 8.00 | 10:00A-2:00P T | 4.00 | U | | U | | U | | U | | | | 12.00 |
| Quintana, Robert | 5:15A-1:45 | 8.00 | 7:30A-1:30P | 6.00 | 5:15A-1:45P | 8.00 | 1:15P-9:45P | 8.00 | | | U | | 8-4:30 | | 30.00 |
| Rafer, Daniele Alexis | | | | | 7:00A-10:00A | 3.00 | 5:15A-1:30P | 7.75 | | | 6:15A-2:45P | 8.00 | 6:15A-2:45P | 8.00 | 26.75 |
| Reehid, Serdar | U | | U | | U | | U | | U | | U | | U | | |
| Runhisar, Erin | 5:30P-9:45P | 4.25 | 1:15P-9:45P | 8.00 | 5:30P-9:45P | 4.25 | U | | 6:00P-11:15P | 8.75 | | | 3:00-9:15P | | 33.25 |
| Badran, Nadine | 1:15P-9:45P | 8.00 | 5:30P-9:45P | 4.25 | 1:30P-9:45P | 7.75 | 2:00P-9:45P | 7.25 | 2:00-11:15 | | | | 7-3:30 | | 27.25 |
| Eckert, Ross | U | | U | | U | | U | | 3:00P-11:15P | 5.25 | 5:00P-11:45P | 6.25 | 3:00P-9:15P | 4.25 | 15.75 |
| Hurtado, Johanna | | | 5:15A-1:45P | 8.00 | 5:15A-1:45P | 8.00 | 5:15A-1:15P | 7.50 | 5:15A-1:45P | 8.00 | | | 8-4:30 | | 31.50 |
| Perez, Jerry | 7:00A-12:00P | 5.00 | U | | 7:15A-12:00P | 4.75 | 7:15A-1:00P | 5.25 | 7:00A-1:00P | 6.00 | 7:00A-1:00P | 6.00 | U | | 27.00 |
| Simkin, Thomas | U | | U | | U | | U | | U | | U | | 9-5:30 | | |
| Visco, Katherine | U | | 8:30A-4:30P | 7.50 | 8:30A-4:30P | 7.50 | | | | | | | | | 15.00 |
| Zneity, Stephan | | | 2:00P-9:45P | 7.25 | | | 5:30P-9:45P | 4.25 | 7:30A-4:00P | 8.00 | 3:15P-11:45P | 8.00 | 2:30P-9:15P | 6.25 | 33.75 |
| ZBHANTOM-Z BHANT | 7:30-4:00 | | 7:00A-12:15P | 5.25 | | | 7:45A-4:15P | 8.00 | 2:00P-11:15P | 8.75 | 8-4:30 | | 12:45-3 | | 30.00 |

| MANAGER'S FORECAST | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPH | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 57.00 | WK TOTAL 57.00 | DAILY 58.25 | WK TOTAL 115.25 | DAILY 51.00 | WK TOTAL 166.25 | DAILY 56.00 | WK TOTAL 222.25 | DAILY 53.00 | WK TOTAL 275.25 | DAILY 44.25 | WK TOTAL 319.50 | DAILY 40.25 | WK TOTAL 359.75 | 359.75 |
| SHIFT COVERAGE | Morning Afternoon Evening 5   6   3 | | Morning Afternoon Evening 5   6   3 | | Morning Afternoon Evening 5   5   3 | | Morning Afternoon Evening 4   4   3 | | Morning Afternoon Evening 4   5   3 | | Morning Afternoon Evening 3   2   3 | | Morning Afternoon Evening 3   4   3 | | |

# Staff Works™
## The Intelligent Labor Scheduler

**SHO...ES @ BOCA CE**
Week Ending 11/23/03

Page 1

| EMPLOYEE NAME | MONDAY 11/17/03 SHIFT | HRS | TUESDAY 11/18/03 SHIFT | HRS | WEDNESDAY 11/19/03 SHIFT | HRS | THURSDAY 11/20/03 SHIFT | HRS | FRIDAY 11/21/03 SHIFT | HRS | SATURDAY 11/22/03 SHIFT | HRS | SUNDAY 11/23/03 SHIFT | HRS | WEEK TOTALS HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pendlebury, Sean Michael | • 7:00A-3:30P | 8.00 | | | | | • 9:00A-5:30P T | 8.00 | • 5:15A-2:15P | 8.60 | | | • 6:45A-12:00P / 3:15P T | 4.75 / 3.25 | 40.50 |
| Deessis, Daimo | • 1:30P-9:45P | 7.75 | U | | • 1:30P-9:45P | 7.75 | U | | U | | • 3:15P-11:45P | 8.00 | • 2:45P-9:15P | 6.00 | 23.50 |
| Morales, Cristina | U | | U | | • 5:00P-9:45P | 4.75 | U | | U | | • 6:15A-3:00P | 8.25 | | | 19.00 |
| Quintana, Robert | • 5:15A-1:45P | 8.00 | • 5:15A-1:45P | 8.00 | | | • 5:15A-1:30P | 7.75 | • 5:15A-1:15P | 7.50 | | | • 9:00A-3:30P | 6.00 | 37.25 |
| Reiler, Daniele Alexis | U | | U | | U | | • 1:15P-9:45P | 8.00 | U | | • 3:00P-11:45P | 8.25 | • 1:00P-9:15P | 7.75 | 24.00 |
| Rashid, Sarder | U | | U | | U | | U | | U | | U | | U | | |
| R Runhaar, Erin | • 5:45P-9:45P | 4.00 | • 1:15P-9:45P | 8.00 | | | | | • 2:00P-11:15P | 8.75 | • 6:45P-11:45P | 5.00 | | | 26.75 |
| Badran, Nadine | • 5:15A-12:00P | 6.25 | • 5:45P-9:45P | 4.00 | | | | | | | • 6:15A-1:00P | 6.75 | | | 17.00 |
| Castro, Julienne | • 7:30A-1:00P | 5.50 | • 7:15A-12:00P | 5.25 | • 7:45A-4:00P | 7.75 | | | • 7:00A-11:00A | 4.00 | | | | | 22.50 |
| Curry, Charles | U | | U | | ...... 7.25 | | • 2:00P-9:45P | 7.25 | • 2:30P-11:15P | 8.25 | | | | | 22.75 |
| Eckert, Ross | | | • 2:30P-9:45P | 6.75 | U | | U | | • 6:45P-11:15P | 4.50 | • 8:45A-3:15P | 6.00 | • 6:45A-1:00P | 5.75 | 16.25 |
| Feret, Carl | • 12:00P-5:00P | 5.00 | • 5:15A-12:00P | 6.25 | | | • 5:45P-9:45P | 4.00 | | | | | | | 15.75 |
| Hurtado, Johanna | • 1:15P-9:45P | 8.00 | • 5:15A-12:00P | 6.25 | • 5:15A-1:15P | 7.50 | • 5:15A-12:00P | 6.25 | U | | U | | • 5:15P-9:15P | 4.00 | 32.00 |
| R Perez, Jerry | • 7:00A-12:00P | 5.00 | U | | • 7:00A-12:00P | 5.00 | • 7:30A-1:00P | 5.50 | • 7:45A-1:00P | 5.25 | U | | U | | 20.75 |
| Vasco, Kathreine | U | | • 8:30A-4:30P | 7.50 | | | • 8:30A-4:30P | 7.50 | • 11:00A-4:30P | 5.50 | U | | U | | 20.50 |
| | | | | | | | | | | | | | | | |
| **MANAGER'S FORECAST** | | | | | | | | | | | | | | | |
| **SPH** | | | | | | | | | | | | | | | |
| TOTAL SCHEDULED HOURS | DAILY 57.50 | WK TOTAL 57.50 | DAILY 45.75 | WK TOTAL 103.25 | DAILY 48.00 | WK TOTAL 151.25 | DAILY 54.25 | WK TOTAL 205.50 | DAILY 52.25 | WK TOTAL 257.75 | DAILY 42.25 | WK TOTAL 300.00 | DAILY 37.50 | WK TOTAL 337.50 | WK TOTAL 337.50 |
| SHIFT COVERAGE (Morning / Afternoon / Evening) | 5 | 5  3 | 4 | 3  3 | 4 | 4  3 | 4 | 4  3 | 4 | 3  3 | 3 | 2  3 | 3 | 3  3 | 3 |

 **Job Description**

Job Group:      Management
Job Family:     Retail Operations
Job Subfamily:

Job Title:      *Retail store manager*

## JOB SUMMARY AND MISSION

This job contributes to Starbucks success by leading a team of store partners to create and maintain the Starbucks Experience for our customers and partners. The store manager is required to regularly and customarily exercise discretion in managing the overall operation of the store. In particular, a majority of time is spent supervising and directing the workforce, making staffing decisions (i.e., hiring, training, evaluating, disciplining, discharging, staffing and scheduling), ensuring customer satisfaction and product quality, managing the store's financial performance, and managing safety and security within the store.

The incumbent is responsible for modeling and acting in accordance with Starbucks guiding principles.

## SUMMARY OF KEY RESPONSIBILITIES

Responsibilities and essential job functions include but are not limited to the following:

**Leadership** – Setting goals for the work group, developing organizational capability, and modeling how we work together:
- Displays a "customer comes first" attitude by training and holding partners accountable for delivering legendary customer service.
- Plans, identifies, communicates, and delegates appropriate responsibilities and practices to store partners to ensure smooth flow of operations.
- Manages with integrity, honesty, and knowledge that promote the culture, values, and mission of Starbucks. Demonstrates a calm exterior presence during periods of high volume or unusual events and manages smooth transitions thereafter to keep store operating to standard and to set an example for the store team.
- Drives the implementation of company programs by developing action plans and directly motivating and instructing the store team to implement them to meet operational and organizational objectives.
- Provides coaching and direction to the store team to take action and to achieve operational goals. Constantly reviews store environment and key business indicators to identify problems, concerns, and opportunities for improvement to provide coaching and direction to the store team to achieve operational goals.

**Planning and Execution** - Developing strategic and operational plans for the work group, managing execution, and measuring results:
- Utilizes existing tools to identify and prioritize communications and regularly uses discretion to filter communications to the store team. Communicates clearly, concisely, and accurately in order to ensure effective store operations.
- Constantly monitors and manages store staffing levels to ensure partner development and talent acquisition to achieve and maintain store operational requirements.

EXHIBIT
3
tabbies

**Business Requirements** – Providing functional expertise and executing functional responsibilities:

- Regularly utilizes management information tools and analyzes financial reports to identify and address trends and issues in store performance.
- Uses all operational tools to plan for and achieve operational excellence in the store. Included are Automated Labor Scheduling, Monthly Status Report, Quarterly Business Review, cash management and inventory management.
- Ensures and is accountable for adherence to applicable wage and hour laws for non-exempt and minor store partners.
- Regularly uses discretion in accessing external resources to support store operations and to execute district and regional initiatives.  This includes Partner Resources, Marketing, Partner & Asset Protection, Food & Beverage, Coffee, and Retail Implementation.
- Solicits customer feedback to understand customer needs and the needs of the community in which the store lives.

**Partner Development/Team Building** - Providing partners with coaching, feedback, and developmental opportunities and building effective teams:

- Challenges and inspires partners to achieve business results.
- Ensures partners adhere to legal and operational compliance requirements
- Develops and maintains positive relationships with store team by understanding and addressing individual motivation, needs, and concerns.
- Actively manages store partners by regularly conducting performance assessments, providing feedback, and setting challenging goals to improve partner performance. Manages ongoing partner performance using performance management tools to support organizational objectives.
- Recognizes and reinforces individual and team accomplishments by using existing organizational tools and programs as well as by finding new, creative, and impactful methods of recognition.
- Utilizes and demonstrates effective management principles and practices to create and maintain a successful store team resulting in an environment where all partners are valued and respected.

## SUMMARY OF EXPERIENCE

- High school or GED
- Three years of progressively responsible retail experience, including one year of supervisory experience
- Experience analyzing financial reports

College degree in business or a closely related field may substitute for a portion of the required experience.

## REQUIRED KNOWLEDGE, SKILLS AND ABILITIES

- Knowledge of supervisory practices and procedures
- Knowledge of customer service techniques
- Strong operational skills in a customer-service environment
- Strong leadership skills with the ability to coach and mentor team partners
- Team-building skills
- Interpersonal skills
- Organization and planning skills
- Strong problem solving skills
- Ability to manage resources to ensure that established service levels are achieved at all times
- Ability to manage multiple situations simultaneously
- Ability to manage effectively in a fast-paced environment
- Ability to plan and prioritize
- Ability to communicate clearly and concisely, both orally and in writing
- Ability to independently manage store operations
- Ability to effectively handle and manage confidential and sensitive information

## DECLARATION OF RENIERO VALDES

I, Reniero Valdes, hereby declare as follows. I am over eighteen years of age and have personal knowledge of the facts set forth in this declaration and would testify competently to them under oath if called as a witness.

1.      I was hired by Starbucks in late 1997 as a Store Manager; however, since there were only a few stores in the South Florida area at that time, I essentially worked as an Assistant Store Manager ("ASM") until I could get my own store, a new store in Palm Beach Gardens, Florida, approximately nine months later. I then transferred to open the West Palm Beach, Florida store at City Place as its Store Manager four years ago. Prior to coming to Starbucks, I gained experience with several management positions in the food service industry.

2.      As I was hired as a Store Manager several years ago, the Retail Management Training ("RMT") program had not yet been implemented. However, I work closely with the program now and assist in the training of new Starbucks' Store Managers. I frequently have an RMT trainee as a partner in my store.

3.      The City Place store is one of the largest volume stores in Southern Florida. Our volume averages between $30,000 and $45,000 per week. It is located within an upscale shopping area. Our clientele is approximately one-half tourists and one-half local customers. We reopened in our current location on September 1, 2004 but while we were under construction we still managed to sell $18,000 per week from a small temporary store.

4.      At any given time throughout the year, I have a total of between 18 and 24 partners in my store for whom I am responsible. I usually have two ASMs helping me but during peak season, from November to April, I typically have one additional ASM. I have never had fewer than five shift supervisors in my store.



EXHIBIT
4

5.       The clientele in this store makes it more difficult to train our partners. Because we serve many tourists, some of the customers have never been to a Starbucks before and we have to be more patient in explaining how Starbucks works to those who have never experienced our products before. Thus, I have to focus my partners on customer service and spend more time training these skills than I had to in my other stores.

6.       I have approximately 465 hours to divide each week between the 18 to 24 partners. The majority of my partners work between 20 and 25 hours per week. Turnover in this store is usually very high and it is my focus to bring it to a lower level. Because of the reputation of the area, we tend to get many college student or recent graduate applicants who will work for short periods and then move on. I usually do interviewing to build my staff and ensure that I am not caught short-staffed. I interview to replace those who leave on an as needed basis.

7.       When I do determine it is time to hire additional partners, I will either begin by accepting and analyzing the applications we accept in my store or contact other local Store Managers to analyze their extra completed applications. In order to keep turnover low, I have implemented a program to have three interviews per applicant. This gives me the opportunity to be completely sure about each candidate before he or she joins my team. I also use the multiple interview process to train my ASMs to perform interviews as they save me time by screening applicants for availability issues and other conflicts. Final hiring decisions for my store are mine. I also determine initial pay rates when I hire a new partner. Right before our busy season, I typically spend 8 to 10 hours per week on reviewing applications, interviewing candidates and making hiring decisions for the staff in my store. When the store is slower, I still spend approximately three hours per week on these issues.

2

8.      Once I hire additional partners it is my responsibility to ensure they are trained properly. I am constantly training and coaching my partners and asking them questions to follow up about the decisions they make every day. I carve time out of my day to train no matter how busy I am because I recognize how important it is to the success of the store. I feel that everything in the store comes back to how the partners are trained and if they are not trained properly, it is my responsibility. I check in with new partners every day and again at the end of each week with additional trainings, coffee tastings and to check on their progress. Although I do take an active role, I do not "hand hold" the RMT trainees, though, through their training. I have high expectations for them and make certain they know they will only make it if they are willing to work. Between my RMT trainees and new partners, I typically spend five hours per week in "formal" training, although I believe I am training every minute I am working.

9.      Along with informal coaching, it is also my responsibility to formally evaluate my partners, which directly determines the partners' pay rates. This includes sitting down and analyzing what I have observed of each partner for the last six months including customer service skills and maintenance of Starbucks' standards. Since evaluations are done on a rolling basis, I usually have a few evaluations to work on at any given time. After I complete the written portion of the evaluation, I will sit each partner down to discuss his or her strengths and weaknesses and work on a plan for him or her for the upcoming evaluation period. Since I constantly coach and communicate with my partners, there are usually no surprises revealed during the formal evaluations. I find this open communications policy helps with store morale and to end issues before they become serious. I usually spend between one and two hours per week on the partner evaluation process.

3

10.     One of my important responsibilities as Store Manager is to create the weekly schedule. I either will do this myself or delegate it to my ASMs to train them to do it. If I do it myself it takes me approximately an hour and a half. If I delegate it, I actually will spend more time on it, approximately two hours, as I work with the ASMs to ensure it is done properly and to finalize it. When I create the schedule, I have to analyze the store's numbers for the past six weeks and partner requests to ensure proper coverage.

11.     It is also my responsibility to make sure my store can remain profitable by maintaining proper inventory levels. This means I must remain on top of our inventory and ensure orders are placed when we run low on popular items. I typically spend approximately two hours per week analyzing our inventory to determine what supplies are needed and placing orders with our various vendors. I also delegate additional ordering to my ASMs to assist with their training and work closely with them to learn proper inventory control.

12.     Although I have trained my shift supervisors to run their shifts on the floor, when I work on the floor I use it as an opportunity to observe the shift supervisors in action and evaluate their performances as leaders. I constantly counsel them as they "supervise" me on the floor. I usually will only step in and take over when an emergency or a situation that the shift supervisor cannot handle arises.

13.     I am the person who customers look to when they have complaints and given our high volume, unfortunately, we have many. As Store Manager, I have the ability to handle them as I see fit. I spend at least a few hours each week handling and attempting to solve customer complaints.

14.     As Store Manager, I spend approximately five hours per week preparing for and holding meetings with various members of my staff. I meet with my ASMs every day to discuss

4

various store issues, such as hiring, profits and losses, and goals for the upcoming days. I also have a meeting with all of my shift supervisors every other week and an all staff meeting once a month. I find it is helpful for store morale to touch base with every individual every day.

15.     Even though partner disputes are rare in my store, it is my responsibility to ensure they do not interfere with my store's business. I will mediate in-store disputes to resolve them but I stress professionalism to my partners so that it does not require my involvement.

16.     Unfortunately, as Store Manager, I must handle disciplinary issues in my store. Whereas some managers will allow a partner to get away with a tardy or two, tardiness is my pet peeve and I will write partners up when they are tardy. I also have the ability to terminate partners if I feel it is necessary. I only enlist assistance from Human Resources when the termination could involve potential legal issues.

17.     My additional responsibilities as Store Managers include reconciling the deposit and auditing registers. I spend one and one half hour per day handling cash for the store, or between seven and eight hours per week. I also periodically pull tills and even allow partners to count them in front of me for a training and loss prevention exercise.

18.     I feel it is important to keep the store involved with the community. It has the added benefit of increasing business as the community feels an attachment to the store. I have the ability to approve requests for donations. Currently, we are selling tiles for a permanent wall in the store. All the proceeds benefit a local philanthropy I selected, the Hospice of Palm Beach.

19.     My District Manager, Brett Patterson, and I have a very good relationship. He treats me with respect and leaves me alone to run my store as I believe appropriate. I always know that when weeks go by and we have not spoken, I am doing my job. I do not like to bother him since I know he has less senior Store Managers who probably have more questions than I do.

He tends to visit once a month for a six hour working day, but sometimes drops in for a few minutes at a time.  He is a great resource and I call on him when I feel I need support; however, he has no day to day involvement with my store.

20.     Brett encourages me to feel a sense of ownership for my store.  I try to instill this attitude in my partners and let them know that even when I am not working I am always available to the store.  I frequently call and check in on the store on my days off.

21.     I have agreed to make this statement voluntarily.  It has been explained to me that I will receive no benefit for making this statement.


I certify under penalty of perjury under the laws of the United States that I have read the foregoing declaration consisting of 21 numbered paragraphs and that it is true, correct and based upon personal knowledge.

Executed on the 10th day of September, 2004 at West Palm Beach, Florida.

Remero Valdes

6